Per Curiam :
This case was referred to Trial Commissioner Franklin M. Stone with, directions to make findings of fact and recommendation for conclusions of law under the order of reference and Eule 134(h). The commissioner has done so in an opinion and report filed on September 30, 1970. Both parties filed notices of intention to except to the commissioner’s report and opinion. However, on February 25,1971, the parties filed a stipulation whereby they withdrew their notices of intention to except stating, in part, that, “With this withdrawal of the notices of intention to except, the Court may now adopt, if it wishes, the Eeport of the Commissioner in the matter pursuant to Eule 141(b).”
Since the court agrees with the commissioner’s opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiff is not entitled to recover on its claim and defendant is not entitled to recover on its counterclaim. The said petition and counterclaim are dismissed.
*708 Stone, Commissioner: Plaintiff seeks to recover moneys expended by its insurance carrier in settling an action brought against plaintiff as a result of personal injuries sustained by an Army private when he came in contact with plaintiff’s power line during a military maneuver. Plaintiff claims entitlement to such reimbursement on the ground that a maneuver permit agreement entered into by and between plaintiff and the Government, which authorized the Armed Forces of the United States to use plaintiff’s rights-of-way and property for the purposes of this maneuver, subject to certain terms and conditions, should be reformed to include a provision indemnifying plaintiff against damages of this kind, or, in the alternative, to recover for breach of contract, i.e., this permit.
Defendant has counterclaimed for medical expenses incurred in the care and treatment of the injured soldier involved, pursuant to the provisions of the Medical Care Recovery Act, 42 U.S.C. §§ 2651-2653.
For reasons hereinafter discussed, it is concluded and held that plaintiff is not entitled to recover under either the theory of reformation of contract or breach thereof, and that defendant is not entitled to recover on its counterclaim.
Plaintiff is a regulated public utility incorporated and existing -under the laws of the State of California, and is the successor to the Needles Gas and Electric Company, a California corporation. Plaintiff is licensed to do business in the State of Nevada, as well as the State of California, and has been engaged in the sale of gas and electricity in both of those states for many years.
Pursuant to the provisions of the Boulder Canyon Project Act of December 21,1928,45 Stat. 1057, plaintiff made application to defendant for, and was granted, certain rights-of-way covering specific public lands located between Boulder Dain, and Needles, California, including the land of concern here. Under the provisions of an agreement dated October 27,1939, approved by the then Secretary of the Interior, which agreement has been periodically renewed, plaintiff was *709 given express permission to construct, operate, and maintain electric power lines on its right-of-way for the transmission of electricity generated at Boulder Dam, and plaintiff exercised these rights. Plaintiff’s right-of-way was granted pursuant to Department of the Interior regulations codified as 43 C.F.R. § 2234.1, et seq.[1] This right-of-way was also governed by a contract entered into between plaintiff and defendant dated December 31, 1962, which merely granted plaintiff a license, revocable at the discretion of an authorized Government official as provided in Department of the Interior’s regulations applicable to rights-of-way incorporated into the contract by reference (43 C.F.R. §2234.1-3 (a)), to construct, install, operate, maintain, replace, or repair its facilities upon property of the United States, under the administrative control and jurisdiction of the Bureau of Reclamation.
In 1963, the U.S. Strike Command, composed of United States Army and Air Force personnel, commenced implementation of plans for a joint military maneuver known as “Exercise DESERT STRIKE” (hereinafter sometimes referred to as the “maneuver,” or “exercise,” or “operation”). The plans contemplated the use of about 12 million acres of desert land located generally along the borders of California, Utah, and Arizona, in those states and the State of Nevada, including the rights-of-way on public land held by plaintiff in Clark County, Nevada, and San Bernardino, California, on which plaintiff had constructed gas lines and electric power transmission facilities.
Plaintiff, along with about 4,400 other holders of fees, easements, and other rights and interests in property desired for use in connection with the maneuver, was contacted by defendant through designated personnel assigned to the U.S. Army Engineer District, Los Angeles, Corps of Engineers, and requested to grant a permit allowing United States Armed Forces personnel engaged in the maneuver to enter upon plaintiff’s rights-of-way for purposes of the exercise.
*710 Prior to and in the early stages of actual negotiations with landholders for maneuver permits, General Frederick Brown, the Commanding General of the Sixth Army, and Col. Earl G. Peacock, the District Engineer of the Los An-geles Army Engineer District, visited various communities in the maneuver area, and made public talks for the purpose of educating people about the planned exercise. During these appearances, General Brown and Col. Peacock made statements to the effect that “[t]he purpose of the permit was to compensate them [the landholders] for any damages regardless of the circumstances if it was related to the actions of the United States troops on * * * the DESERT STRIKE maneuver or connected with the maneuver in any way.”
Plaintiff at first refused to grant a permit because it was not satisfied with oral assurances of the above nature, nor with statements made in letters sent to plaintiff by other Government personnel requesting it to sign a permit, that every effort would be made by defendant to protect plaintiff’s facilities and avoid damage in crossing its property and right-of-way, and that “[a]ny damage attributable to the maneuver will be promptly repaired or reimbursement made in lieu thereof.” Plaintiff desired and requested defendant to incorporate, among other things, an indemnity clause in the permit that would protect and save harmless the plaintiff against all future third-party claims for damages, injuries, and deaths. Thereafter, a revised permit, which contained an added provision relating to such claims, was sent to plaintiff for signature with a letter dated March 19, 1964, and signed by Col. Peacock. Plaintiff still had a number of objections to the permit as revised, and remained unconvinced that the added provision mentioned above afforded plaintiff the protection it desired. Accordingly, plaintiff discussed its various objections over the telephone with representatives of the Government and requested that additional provisions, including an indemnity clause that would save harmless the plaintiff against all future third-party claims for damages, be included in the permit.
*711 After several refusals by plaintiff to sign a permit, Col. Peacock personally entered and participated in the negotiations with, plaintiff. He contacted Mr. L. E. Cooper, Vice President and Chief Engineer of plaintiff corporation, and in a series of telephone conversations with him discussed plaintiff’s objections to the permit, and gave assurances that not only damages to plaintiff’s property and facilities arising out of operation Desert Strike, but also third-party damage claims, would be paid by the Government. However, the only example of a third-party claim ever suggested by Mr. Cooper, or any other representative of plaintiff, and discussed with Col. Peacock, was the loss of income arising out of interruption of service to plaintiff’s customers.
Subsequent to the conversations Col. Peacock had with Mr. Cooper, mentioned hereinbefore, and other telephonic discussions between plaintiff and Government representatives, Col. Peacock sent another letter to plaintiff, dated March 27, 1964. Since this letter is considered very important, it is quoted in part below:
Deference is made to our letter dated 19 March 1964 and subsequent telephonic conversations between your Mr. C. Gilbertson and representative of this office relative to right-of-way crossing permit in connection with a joint Army and Air Force exercise * * *.
As discussed in telephonic conversation, the proposed permit has been revised to include the following:
fa) Tie down of antennas;
(b) Restriction as to crossing 4-inch gas line East of Needles;
(c) Pole line clearances to be in accordance with National Electric Code in Nevada and GO#95 in California, and
(d) Vehicles and tanks will not cross under wires closer than 25 feet or farther than 50 feet from a pole.
Paragraph 8 has been added to the permit to provide for California Pacific Utilities Co. as owner of the permitted premises to implead the United States as a third party defendant. This addition is necessary because no authority exists whereby the Government can be bound to an agreement indemnifying a party against future damage. Based on provision ox 31 USC 665, the courts *712 have consistently ruled that clauses relating to indemnification for future damage cannot be entered into on behalf of the United States.
It appears that the permit enclosed with the above letter was again revised by plaintiff to include additional language. The permit was drafted in the form of an undated letter agreement addressed to the District Engineer, U.S. Army Engineer District, Los Angeles; approved and signed by Mr. E. K. Albert, President of plaintiff corporation, on March 30, 1964; and thereafter sent to, and signed on behalf of the Government by, Mr. John Houston, Acting Chief of the Peal Estate Division of the Los Angeles Engineer District, on April 1,1964.
The wording of this permit is not unambiguous, but in substance it granted defendant the right to enter and maneuver upon plaintiff’s lands and rights-of-way, and to extend communication lines over and across plaintiff’s transmission lines rights-of-way subject to defendant taking certain precautions, and provided that defendant pay plaintiff for certain damages if any such damages were, in fact, sustained by it. There is no dispute between the parties that Paragraph 8 under Part II of the permit signed by them contains the same language as the new Paragraph 8 added to the proposed permit enclosed with Col. Peacock’s March 27, 1964 letter to plaintiff, partially quoted hereinbefore.
Plaintiff constructed, maintained and used electric power transmission lines on its rights-of-way between Searchlight, Nevada, and Needles, California, including, among other facilities, three high tension lines strung between two poles, one designated 45-1 and the other 45-2. Both of these poles were set in an area of land which encompassed elevated ground known as “Black Hill,” located in the State of Nevada, about 3 miles south of Searchlight. Pole 45-1 was situated on flat ground near the base of Black Hill at a point 1050 feet south of Pole 45-2, which was located about halfway up said hill.
Private Billy Joe Hendry, a radio-telephone operator, was a member of an infantry company engaged in the maneuver whose assigned objective was to secure Black Hill. *713 In compliance with, an order from his Company Commanding Officer, Private Hendry proceeded up the hill with the intention of making personal contact with other radio operators who were then walking ahead of him toward the top of the hill. At that time, he was carrying on his baek a portable field pack radio equipped with a 10-foot antenna. As Private Hendry was walking under plaintiff’s power lines strung between Poles 45-1 and 45-2, the antenna on his radio came in contact with one of these lines at a point thereon later determined to be 380 feet south of Pole 45-2, causing him to sustain severe injuries. This accident occurred about 11:30 A.M. on May 18,1964.
As a result of this accident, both of Private Hendry’s legs were badly burned and ultimately amputated. After amputation, a number of surgical procedures involving, among Other things, plastic surgery or skin grafts, were performed on his legs. The Government paid medical expenses for the necessary care and treatment of Private Hendry in the amount of $7,460.48, which sum the parties stipulated was fair and reasonable.
In October 1965, Private Hendry filed an action in a Nevada State District Court against plaintiff, praying for damages in the amount of $650,000. Thereafter, the case was transferred to the United States District Court for the District of Nevada. Plaintiff unsuccessfully attempted to have defendant take over the defense of the suit brought by Private Hendry. A motion filed in the U.S. District Court by plaintiff to serve a third-party summons and complaint directed to defendant was opposed by Hendry’s attorney, arid denied by the Court. Defendant did not cooperate with plaintiff in the defense of Hendry’s said suit and simply took a neutral position with respect thereto, stating, in substance, that the Government would not actively aid either party in the investigation of the case, but that upon request, it would furnish both parties with such information as was in defendant’s possession.
Fearing a jury verdict far in excess of $350,000, Private Hendry’s suit against plaintiff was, with the approval of the U.S. District Court, settled virtually on the eve of trial for *714 said amount by plaintiff’s insurance carrier. Defendant did not participate in, consent to, or authorize in any way whatsoever, this settlement. During the trial of the instant case, the parties stipulated that the sum of $350,000 was a fair and reasonable amount for the settlement of Private Hendry’s claim against plaintiff. Attorneys’ fees and expenses in the fair and reasonable amount of $24,000 also were paid by plaintiff’s insurance company in connection with the defense of the action Private Hendry instituted against plaintiff. The evidence in the record does not support plaintiff’s contention that another sum in the fair and reasonable amount of $3,000 was necessarily and actually expended by plaintiff’s insurance company in payment for services rendered by an electrical consultant in the course of preparing for the defense of Private Hendry’s suit against plaintiff.
Plaintiff requested indemnification from defendant for the amounts assertedly expended by plaintiff’s insurance carrier in connection with the defense and settlement of Private Hendry’s suit against plaintiff. Defendant refused to reimburse plaintiff for such expenditures. Thereafter, on December 4,1967, plaintiff filed a petition in this court, and an amended petition on August 11,1969, praying for judgment against defendant for the sum of $377,000, plus interest together with an unstated amount of costs and disbursements relating to the instant action.
I
The first issue is whether plaintiff is entitled to reformation of the permit at bar, either on the ground of mutual mistake as to the legal effect of the provisions of 31 U.S.C. § 665 (1958) or on the basis of mistake in the expression of the parties’ intent. Plaintiff contends that the parties intended an indemnification provision as part of the permit and, therefore, it should be reformed. Defendant argues that plaintiff has not shown any grounds for reformation and, therefore, reformation of this permit should be denied. Plaintiff asserts that section 665 does not apply to the present case, but defendant contends to the contrary and argues that it prohibits *715 tbe inclusion of indemnity provisions in Government contracts, thereby making reformation here inappropriate.
In resolution of a threshold question raised by this issue it should be stated that, as a general rale, the Court of Claims has jurisdiction to reform a Government contract as an incident to the rendition of a money judgment. Jones & Sears, Inc. v. United States, 158 Ct. Cl. 162 (1962); Jansen v. United States, 170 Ct. Cl. 346, 344 F. 2d 363 (1965); Chernick v. United States, 178 Ct. Cl. 498, 372 F. 2d 492 (1967). Thus, this court has jurisdiction to reform the contract (permit) in question.
Section 665, sufra, provides in pertinent part:
(a) Expenditures or contract obligations in excess of fund's prohibited.
No officer or employee of the United States shall make or authorize an expenditure from or create or authorize an obligation under any appropriation or fund in excess of the amount available therein; nor shall any such officer or employee involve the Government in any contract or other obligation, for the payment of money for ¡any purpose, in advance of appropriations made for such purpose, unless such contract or obligation is authorized by law.
The United States Supreme Court, the Court of Claims, and the Comptroller General have consistently held that absent 'an express provision in an appropriation for reimbursement adequate to make such payment, section 665 proscribes indemnification on the grounds that it would constitute the obligation of funds not yet appropriated. Chase v. United States, 155 U.S. 489 (1894); Hooe v. United States, 218 U.S. 322 (1910); Sutton v. United States, 256 U.S. 575 (1921); Leiter v. United States, 271 U.S. 204 (1926); Goodyear Co. v. United States, 276 U.S. 287 (1928); Shipman v. United States, 18 Ct. Cl. 138 (1883); City of Los Angeles v. United States, 107 Ct. Cl. 315, 68 F. Supp. 974 (1946); 33 Comp. Gen. 90 (1953); 35 Comp. Gen. 85 (1955). The cases cited by the plaintiff are inapposite.
As shown hereinbefore, by letter dated March 27,1964, and signed by Col. Peacock, section 665 proscribed the indemni *716 fication clause plaintiff desired to be included in the permit in question. In drafting the permit, plaintiff included the provision suggested and explained by Col. Peacock in the above-mentioned letter, as an alternative to an indemnification provision. Thus, there was no misunderstanding between plaintiff and defendant as to the legal effect of section 665. Furthermore, there is no express provision in an appropriation act for the fiscal year in question for reimbursement of damages such as plaintiff sustained. Therefore, section 665 prohibits the inclusion of an indemnity provision in this permit. Since to reform this contract to include an indemnification provision would be to create a contract proscribed by law, reformation is not appropriate in the instant case. National Electronics Lab, Inc. v. United States, 148 Ct. Cl. 308, 180 F. Supp. 337 (1960).
The testimony shows that during his telephone discussions with Mr. Cooper and subsequent conversations with other employees of plaintiff, prior to the time plaintiff signed the permit in question, Col. Peacock made substantially the same statements and representations, with respect to the damages that the Government would pay, as those expressed by both him and General Brown at the time they appeared before groups of landholders and explained the purpose of the maneuver permit, mentioned earlier.
Plaintiff’s Vice President and Chief Engineer, Mr. Cooper, testified that he read Col. Peacock’s March 27, 1964 letter but that despite this fact, he understood from statements previously made by Col. Peacock that plaintiff would be held harmless from any damage claims and suits arising out of injuries sustained by military personnel or other third parties. This testimony is rejected as incredible and unsupported by other acceptable evidence. Under the facts and circumstance's in the instant case, neither Mr. Cooper, personally, nor plaintiff was justified in believing that plaintiff was protected to any greater extent than that afforded by the terms of the permit agreement, or in relying on any representations which may have been made by Col. Peacock or other Government representatives, that are not encompassed by provisions actually incorporated in the permit.
*717 The testimony shows that although at the times Col. Peacock made the statements in question previously referred to, he primarily had in mind damages to property and did-not specifically mention personal injuries, he intended to pay valid claims for damages arising from such injuries, as well as for damages to property and facilities, including third-party damages; and that he then thought he had the authority to make such representations and payments. However, it is clear that Col. Peacock did not consider all factors, circumstances, conditions, and possibilities in forming his aforestated intentions and making the statements indicated relative to the payment of damages by the Government; that it never occurred to him that the Government would be called upon, or obligated, to pay for injuries sustained by military personnel engaged in the maneuver, and did not agree to pay damages for such injuries; and that he never intended or agreed to pay for any damages resulting from negligence on the part of plaintiff or acts of God.
While an absolute save harmless clause may have been desired by plaintiff, it was not the clear and unambiguous intention of both parties that plaintiff be indemnified in situations such as the one present in this case. The unilateral subjective intent or wishes of one contracting party cannot prevail over express declarations in the contract to the contrary. Henley v. United States, 184 Ct. Cl. 315, 396 F. 2d 956 (1968); L. Rosenman Corp. v. United States, 182 Ct. Cl. 586, 390 F. 2d 711 (1968); Commercial Metals Co. v. United States, 176 Ct. Cl. 343 (1966); Jack Stone Co. v. United States, 170 Ct. Cl. 281, 344 F. 2d 370 (1965).
Mr. John Houston, Acting Chief of the Eeal Estate Division of the Los Angeles District, U.S. Army Corps of Engineers, who drew up the initial permit and signed the final revised permit, had delegated authority from his immediate superior, Col. Peacock, to negotiate for, and to acquire, maneuver permits. Mr. Houston presented credible and acceptable testimony that he never intended to indemnify plaintiff in cases where plaintiff was negligent, that he knew indemnification provisions were contrary to law, and that the permit involved 'here accurately reflects his intentions *718 as to the rights, duties and responsibilities of the parties at the time he signed the permit on behalf of the Government.
While Col. Peacock may have thought at one time he had the authority to include an indemnity provision in the permit and plaintiff desired such a provision, it is clear from the credible testimony presented by him that he never contemplated a situation like the instant case and that he only gave specific assurances to plaintiff that it would be reimbursed by the Government for damages to property or facilities, and for damages to third parties involving the loss of revenue from interrupted service. Col. Peacock testified that the permit in issue expressed his intentions at the time it was signed by the parties. Prior to the signing of the final version of the permit, Col. Peacock unequivocally informed plaintiff in writing that he had no authority to include an indemnification provision in the permit. In any event, one who deals with a Government agent is charged with notice of the limits of his authority. Richards & Associates v. United States, 177 Ct. Cl. 1037 (1966); Vogt Bros. Mfg. Co. v. United States, 160 Ct. Cl. 687 (1963). Therefore, plaintiff knew, or should have known, that this permit could not and did not include an indemnity provision.
Plaintiff never called its president, Mr. E. K. Albert, who signed the permit on behalf of plaintiff, to testify, nor offered an acceptable or reasonable explanation for its failure to do so. Therefore, it is reasonable to conclude that had Mr. Albert testified, he would not have given testimony favorable to plaintiff as to his intent with respect to an absolute save harmless clause. Interstate Circuit, Inc. v. United States, 306 U.S. 208 (1939); Fisher v. United States, 94 Ct. Cl. 511, 40 F. Supp. 997 (1941); Rice Barton Corp. v. United States, 115 Ct. Cl. 575, 88 F. Supp. 271 (1950); Alpirn v. United States, 124 Ct. Cl. 670, 111 F. Supp. 280 (1953).
In light of the acts antecedent to, and contemporaneous with, the making of the contract at bar, i.e., the permit, plaintiff has not only failed to show a mutual mistake as to the legal effect of section 665, supra, but also has failed to prove by clear and convincing evidence a mutual mistake by the parties in the expression of their true intent. To the contrary, *719 the evidence is convincing that plaintiff desired an indemnity provision covering any damages and reluctantly settled for lesser protection.
To reform the maneuver permit so as to include an indemnification permit would not only create a contract proscribed by law, but would permit plaintiff to recover for its own negligence in failing to properly maintain its power lines and in failing to mark said lines with any warning signs or devices. In United States v. Seckinger, 397 U.S. 203 (1970), the Supreme Court, at p. 211, stated:
* * * a contractual provision should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties. * * *
See, also, cases cited in footnotes 15 and 16 of the SecMnger case.
Since it was not clearly the intention of either plaintiff or defendant, and certainly not the intention of both parties, that an indemnification provision be included in the maneuver permit at issue, and since, as shown and discussed in detail hereinafter, plaintiff was negligent, reformation is not appropriate in the present case. The negotiations preceding the execution of the permit make clear that although plaintiff desired an indemnification provision be incorporated therein and Col. Peacock personally probably would liked to have accommodated plaintiff in this respect, such a provision was deliberately left out. Plaintiff, as the drafter and as moving party, has failed to satisfy its burden of proof requisite to reformation. The permit represents the final agreement of the parties, and thus, plaintiff is not entitled to have the contract (permit) in question reformed so as to include an indemnity or absolute save harmless provision.
II
The second issue raises the two-part question as to whether Col. Peacock had the requisite authority to include an absolute save harmless clause in the permit involved herein and, if he did not have such authority, whether or not defendant is estopped from denying the same. Plaintiff con *720 tends that defendant is estopped to deny Col. Peacock’s authority to include an indemnity clause in the permit in question because he was assertedly acting within the scope of his actual authority in making certain statements and representations, mentioned hereinbefore, pertaining to the payment of damages by the Government, and plaintiff relied on such statements to its detriment. Defendant argues that since no Government officer is authorized to include an absolute save harmless or indemnity clause in a Government contract, such a clause is not within the scope of authority of any Government agent, and, therefore, the doctrine of estoppel is inapplicable to the present case.
As a general rule, estoppel does not work against the Government. However, the United States may be estopped by acts of its agents, officers, or employees when they act within the scope of their authority. Biggs Rental Co. v. United States, 173 Ct. Cl. 789, 353 F. 2d 1013 (1965). If, on the other hand, any such person acts outside the scope of the authority actually held by him, the United States is not estopped to deny his unauthorized or misleading representations, commitments, or acts, because those who deal with a Government agent, officer, or employee are deemed to have notice of the limitations on his authority, and also 'because even though a private individual might be estopped, the public should not suffer for the act or representation of a single Government agent, especially when the representation in question would encourage an act proscribed by law. Utah Power & Light Co. v. United States, 243 U.S. 389 (1917); Bianco v. United States, 171 Ct. Cl. 719 (1965); Bornstein v. United States, 170 Ct. Cl. 576, 345 F. 2d 558 (1965); Potter v. United States, 167 Ct. Cl. 28 (1964), cert. denied, 382 U.S. 817 (1965); Vogt Bros. Mfg. Co. v. United States, supra; Byrne Organization, Inc. v. United States, 152 Ct. Cl. 578, 287 F. 2d 582 (1961); Nat'l Electronics Lab., Inc. v. United States, supra. The Government is not estopped from repudiating advice given by one of its officials if that advice is erroneous, von Kalinowski v. United States, 151 Ct. Cl. 172 (1960), cert. denied, 368 U.S. 829 (1961). Where a Government official approves and promises reimbursement beyond that allowed by applicable law, *721 any payments made under such imauthorized actions are recoverable by the Government. W. Penn Horological Inst. v. United States, 146 Ct. Cl. 540 (1959). An oral assurance of reimbursement beyond the scope of a Government agent’s authority does not expand the Government’s contract obligation beyond the terms of such contract, Richards & Associates v. United States, supra.
While Col. Peacock may have been clothed with apparent authority to make certain oral assurances that he did to plaintiff, with respect to the payment of damages by the Government, resolving all contradictions and ambiguities in such assurances in plaintiff’s favor, he did not have the authority to include an indemnification provision in the maneuver permit in question, and prior to the time it was signed, he clearly informed plaintiff in writing of this fact. Accordingly, defendant is not estopped to deny or repudiate Col. Peacock’s authority as to any such oral representations that he may have made to the contrary because they were not within the scope of his authority and plaintiff had actual notice thereof. Plaintiff cannot say it properly relied on any representations Col. Peacock may have made to the effect that an absolute save harmless or indemnity clause would be included in the permit, either specifically or impliedly, in light of the fact that (1) plaintiff negotiated for and insisted upon reducing to writing all guarantees for reimbursement for damages sustained by it; (2) Col. Peacock’s March 27, 1964 letter repudiated any authority in himself or any other Government representative to enter into an agreement including such a clause; and (3) the permit in question does not contain such a clause and plaintiff used the substitute provision suggested by Col. Peacock in lieu thereof when it drafted the final version of the permit. Therefore, even if Col. Peacock’s representations were authorized, the doctrine of estoppel would not apply to the present case because plaintiff did not rely thereon. Since Col. Peacock’s asserted oral representations as to an absolute save harmless or indemnity clause were not authorized and since this permit does not include such a clause, the permit cannot be reformed and expanded to include such a provision.
*722 ill
The third issue arises out of plaintiff’s contention that defendant breached the contract, i.e., the permit agreement, between the parties by failing to comply with certain conditions and directions, and to observe specific precautions, enumerated therein. Defendant disputes plaintiff’s afore-stated contention and asserts that if there was any breach of contract, that breach was by plaintiff for failure to maintain its power lines in question in accordance with the National Electrical Safety Code, as required by applicable rules promulgated and adopted by the Public Service Commission of the State of Nevada, the provisions of the National Electrical Safety Code, the regulations of the Department of the Interior, controlling statutory law, and the provisions of the permit.
The respective allegations, counter-allegations, and denials of the parties relating to breach of contract raise questions of, among other interrelated matters, negligence on the part of both plaintiff and defendant. The resolution of these questions is essential and dispositive of this phase of the controversy between the parties.
The question of breach of contract as a result of negligence on the part of plaintiff will be discussed first. The codified regulations of the Department of the Interior and other agreements between the parties, which constituted the contract under which defendant granted plaintiff rights-of-way and licensed it to construct, maintain, and use power transmission facilities thereon, as well as applicable rules and regulations adopted by the Nevada State Public Service Commission, which have the force and effect of statutory law in said State, require that power lines be maintained in accordance with the minimum vertical ground clearances provided by the National Electrical Safety Code. While the permit in question refers to the “last publication of the National Electrical Code for use in Clark County, Nevada,” the permit does not expressly require compliance with the National Electrical Safety Code standards; however, such a requirement is implied by said permit because defendant *723 had a right to assume that minimum statutory precautions would be taken by plaintiff and there is an implied warranty to that effect in this permit, since the permit specifically required defendant in installing communication lines on plaintiff’s poles to observe minimum statutory clearances. Implicit in this requirement is that plaintiff’s power lines meet the same standards.
The best evidence in the record shows that on the day of the accident causing the injuries sustained by Private Hendry, the vertical clearance of plaintiff’s power line from the ground at the point where the antenna on Hendry’s radio came in contact with the line was 13 feet 4 inches. A series of measurements of this power line subsequently made on August 22, 1965, established that on said date the line was considerably below the National Electrical Safety Code standards at several points. The east and west (or downhill and uphill) lines, respectively, were 16 feet 5 inches and 13 feet 9 inches from the ground at a point 452 feet north of pole 45-1, and were 14 feet 2 inches and 12 feet 4 inches from the ground at a point 680 feet north of pole 45-1.
Credible testimony was presented that no changes had been made in the line between the time of the accident and the time these measurements were made. At the time of the accident, Private Hendry was 5 feet 8 inches in height, and the 10-foot antenna attached to the radio he was then carrying extended about 9 to 9y2 feet over his head. Thus, it is apparent that the antenna could not have extended higher in the air than 15 feet 2 inches, and that he possibly would have made contact with any of plaintiff’s power lines or portions thereof that were at or lower than 15 feet 2 inches.
Mr. Boy St. Coeur, plaintiff’s line foreman assigned to its District office in Needles, California, and Mr. Carl Myers, plaintiff’s local agent in Searchlight, Nevada, were required to make independent inspections of the power lines in question each month, and to report any line found to be out of order, or defective, or considered to be dangerous and a safety hazard. They did not make actual measurements of the height of a line unless it appeared to them to be too low. They had not been given instructions with respect to mini *724 mum vertical clearances but they were familiar with the National Electrical Safety Code.
Mr. Lowell J. Kays, plaintiff’s District Manager at Needles, California, Mr. St. Coeur, and Mr. A. B. Gilbertson, engineer in plaintiff’s headquarters office in San Francisco, all testified that they would consider a power line in the general area involved at the distance from the ground at which the line in question was measured, to be, or border on being, dangerous, but that they did not consider the line at the particular point where Private Hendry was injured to be too low because persons normally did not enter this area and only a person on foot could cross under this line at that point. In this connection, Messrs. Kays, St. Coeur, and Myers stated that the area between the two poles was not used by persons on foot, and that ordinary motor vehicles could not make it up Black Hill on account of its steepness and the presence of loose boulders and other obstacles. Mr. St. Coeur further testified that in the 16 years he had worked for plaintiff and patrolled lines, he had never seen anyone walking in the area of this hill. However, it should be noted that factors such as isolation and lack of general use by pedestrians are specifically considered in the National Electrical Safety Code in setting minimum vertical clearances for power lines. In this connection, it is considered significant to mention that the credible testimony shows that after this accident, Mr. Kays had a pole interset between poles 45-1 and 45-2, partially because he thought the lines between these two poles were too low.
Normally, if a line was considered dangerous, plaintiff immediately made the necessary repairs or corrections. If such a condition could not be eliminated right away, a man was stationed to guard the point, or warning devices were placed in the area, or the power was turned off. Plaintiff took none of these actions in the instant case.
It is impossible to ascertain from the record the exact height required for the power lines in question by the National Electrical Safety Code (Code). However, it is clear that both at the time plaintiff’s lines were constructed and the time of the accident involving Private Hendry, the Code *725 required a minimum vertical clearance in excess of 24 feet. Rule 230E of this Code expressly requires that lines be maintained at the height at which they were constructed. Therefore, plaintiff’s contention that the Code does not apply to the maintenance of an existing line is not well founded. While there is no evidence in the record as to either Rule 230E or the standards for minimum vertical clearance set by the Code at the time of this accident, judicial notice is hereby taken that between the time the power lines in question were constructed and the time of this accident there were no changes in Rule 230E or the standards for minimum vertical clearance.[2]
For the foregoing reasons, it is concluded that plaintiff’s failure to maintain its power line in accordance with the National Electrical Safety Code standards not only constituted negligence, but constituted a breach of its contract (permit) with the defendant, and a breach of the contract granting plaintiff its right-of-way.
Plaintiff never furnished defendant with certain information, specifically requested by it in various letters, concerning such things as places where plaintiff’s power lines could be safely crossed and the location, height, and voltage of said lines, except to the extent such information was directly or inferentially indicated by the wording of the permit itself. However, prior to the commencement of this maneuver, defendant had made a reconnaissance of the entire maneuver area, was aware of the existence of plaintiff’s power lines, and had strung communication lines from plaintiff’s poles involved here.
Since defendant had notice of plaintiff’s breach of the maneuver permit prior to Private Hendry’s injury by virtue of the reconnaissance it made of the área and the stringing of communication lines on poles at or near the scene of the *726 accident, defendant waived such breach by continuing to perform under the contract (permit). Specialty Assembling & Packing Co. v. United States, 174 Ct. Cl. 153, 355 F. 2d 554 (1966); Acme Process Equipment Co. v. United States, 171 Ct. Cl. 324, 347 F. 2d 509 (1965) rev. on other grounds, 385 U.S. 138 (1966); Star Woolen Co. v. United States, 159 Ct. Cl. 62, 309 F. 2d 409 (1962).
Plaintiff, in support of its breach of contract contention briefly mentioned hereinbefore, specifically argues that certain safety precautions made requisite by the provisions of the maneuver permit were not disseminated to the military personnel participating in the maneuver. As an example of such a breach, plaintiff asserts that a warning (“Don’ts” list) was issued by defendant, which did not contain the precautions recited in the permit.
As to the foregoing, the evidence shows that the Los An-geles Engineer District prepared a precautionary “Don’ts” list, which purportedly referred to certain things mentioned in the permit that were not supposed to be done. This list was sent to the Desert Strike Command Headquarters with a recommendation by Col. Peacock that a copy of the list be placed in the hands of every soldier engaged in the maneuvers. According to Col. Peacock, this list included, among a large number of things, information concerning the tie-down of antennas on vehicles crossing under power lines, as required by the permit. There is no evidence that this particular list was ever distributed in accordance with Col. Peacock’s recommendation or that the information contained therein was passed on to military personnel involved in the maneuver. The evidence does show that a combination “Don’ts” and “Do’s” list was prepared which stated that all vehicles moving under high voltage electrical transmission lines be operated with extreme caution, pointing out “[t]he clearance between the lines and vehicles with antennas or other gear may be insufficient to prevent a high-voltage arc to the vehicle.” There is no evidence that this list is the same as to form and content as the one recommended by Col. Peacock, nor is there any evidence showing what, if any, distribution was made of this or any other similar document.
*727 In any event, the uncontradieted testimony was that Private Hendry’s unit never received such a “Don’ts” list. Failure to disseminate a “Don’ts” list does not necessarily constitute a breach of the maneuver permit, since information and instructions as 'to the places for crossing under power lines and the manner in which to cross under power lines could be furnished to troops in the field by means other than a “Don’ts” and/or “Do’s” list.
The defendant, as well as plaintiff, knew, or should have known, that high tension power lines were strung across plaintiff’s right-of-way at the place of the accident where Private Hendry was injured, and both parties knew, or should have recognized, that such power lines posed potential danger to troops participating in the maneuvers. Despite the foregoing, plaintiff took no precautions and gave no warning to defendant as to the dangerously low condition of its power lines, except to the extent that the maneuver permit served as a warning. An ambiguous, at best, warning to a principal is of such little value to an agent or principal as to be nonexistent. Plaintiff was negligent in failing to post warning signs in this area or otherwise inform defendant of the dangerous condition of its lines therein.
Some limited precautions were taken and some warning of hazards to be encountered was given by defendant. Lt. Charles Hohertz, who testified at the trial, taught classes on hazards to be encountered during Operation Desert Strike, including, inter alia, the danger of high voltage electric lines, to Private Hendry’s unit.
Private Hendry testified to the effect that he was aware of the dangers involved if the antenna on the portable radio he was carrying came into contact with a power line, but that he did not see the power line in question, prior to his making contact with it, primarily because the weight of the equipment he was carrying forced him to bend over, and he was watching for snakes and loose rocks. All of the military personnel in the immediate vicinity where the accident occurred, who testified at the trial, except Private Hendry who admitted seeing one pole o'f some kind near the base of Black Hill, stated that they did not see either the power lines or poles involved before the accident. There is no evidence that *728 any of these soldiers knew .power lines were in the immediate area or were even thinking of such a possibility.
The Government also was negligent and derelict in discharging its responsibilities-by failing to specifically inform military personnel that high voltage power lines were strung across the Black Hill area into which they were under orders to proceed, to outline appropriate and adequate precautionary measures to be taken by them when crossing under the power lines located in said area, and to post warning signs or alert the soldiers in some way of the dangerous conditions they could expect to encounter.
The permit in question does not expressly require the tie-down of antennas on portable radios carried by foot soldiers, nor does it expressly require that foot soldiers cross under plaintiff’s power lines at any particular points or places. With respect to the tie-down of radio antennas and crossing under power lines, the permit expressly refers only to vehicles and “equipment.” However, by implication at least, the requirement with respect to the tie-down of radio antennas included the tie-down of antennas on radios carried by foot soldiers, as well as antennas on radio-equipped vehicles, since radios equipped with antennas, such as the one Private Hendry admittedly was carrying at the time he was injured, certainly must be considered as coming within the term “equipment,” 'as that word is used in the permit. Private Hendry was not instructed to tie down the antenna on the radio he was to carry during the maneuvers in question, and he did not do so. Under the circumstances here, the failure of defendant to see to it that the antenna on Private Hendry’s radio was tied down constituted a breach of contract on the part of defendant. Furthermore, the record reveals that in at least one other instance, the radio antennas on vehicles, as well as antennas on radios carried by foot-soldiers other than Private Plendry, were not tied down while crossing under plaintiff’s power lines.
Private Plendry was crossing on foot under plaintiff’s power lines about 380 feet from the nearest pole at the time of his accident. The permit provides that the places for crossing under power lines shall be at least 25 feet and no more *729 than SO feet from the nearest pole. However, the permit only imposes this requirement as to crossings expressly on vehicles. In view of plaintiff’s insistence on expressly referring to different types of damages in this permit, that plaintiff drafted the permit, the differences between vehicular and pedestrian traffic, and the fact that plaintiff knew the purpose of the permit was for maneuvers, an implied requirement that soldiers on foot are to cross under power lines only where vehicles may cross is not read into this permit.
From the. facts related above and from the record, it is clear that the negligence of plaintiff joined with the breach of contract by defendant and its negligence in proximately causing the injuries to Private Hendry. In determining the amount of damages with respect to a Government contract, Federal law controls. Under Federal law, the doctrine of comparative negligence applies in situations like the instant case. See Seckinger, supra, and the cases cited in footnote 20 thereof; Federal Employers’ Liability Act, 45 U.S.C. § 51, et seq.; Jones Act, 46 U.S.C. § 688. It is well settled under the doctrine of comparative negligence that if plaintiff’s negligence is equal to, or greater than, defendant’s negligence, any recovery by plaintiff is barred. 38 Am:. Jim. Negligence § 231 (1941); 65A C.J.S. Negligence § 169 (1966). In the instant case, plaintiff’s negligence in failing to properly maintain its power lines and in failing to properly warn military personnel of dangerously low power lines, is at least equal to, if not greater than, defendant’s negligence attributable to defendant’s breach of contract in failing to instruct Private Hendry to tie down the antenna on his radio and to warn him by some means that low-hanging, live, high voltage lines were in the area where he was or was going to be. Therefore, plaintiff may not recover any damages by reason of defendant’s breach of contract.
IV
The fourth issue raises the question as to whether plaintiff is entitled to recover the amount expended by plaintiff’s insurance carrier in defending and settling the law suit brought against plaintiff by Billy Joe Hendry, as a matter of due *730 process of law. Plaintiff seems to have raised this Fifth Amendment argument as an afterthought.
Plaintiff argues that some payments were made to other persons for damages sustained by them arising out of the military maneuvers involved here, and that, therefore, due process requires that plaintiff recover for the damages it sustained.
During the course of presenting testimony at the trial, Col. Peacock made statements of a general nature indicating that adjustments and reparations were made to some holders of interests and rights in property damaged as a result of the maneuvers. Plaintiff failed to produce any proof, and there is no evidence in the record, as to the identity of the persons to whom any such payments were made, the kind or amount of damages sustained by them, or whether these persons had granted permits identical or substantially similar to the one signed by plaintiff. Therefore, plaintiff has failed to prove a violation of the Fifth Amendment to the Constitution or any other part thereof. Thus, plaintiff is not entitled to reimbursement under the af orestated, or any other, theory of recovery asserted by it herein.
V
The fifth and final issue concerns defendant’s counterclaim that it is entitled to recover $7,460.48 from plaintiff pursuant to the Medical Care Recovery Act, 42 U.S.C. § 2651 (a), which provides:
§ 2651. Recovery by U'rt'~tecZ States- (a) Conditions; exceptions; persons liable; amount of recovery; subro-gation; assignment.
In any case in which the United. States is authorized or required by law to furnish hospital, medical, surgical, or dental care and treatment (including prostheses and medical appliances) to a person who is injured or suffers a disease, after the effective date of this Act, under circumstances creating a tort liability upon some third person (other than or in addition to the United States and except employers of seamen treated under the provisions of section 249 of this title) to pay damages therefor, the United States shall have a~ right *731 to recover from said third person the reasonable value of the care and treatment so furnished or to be furnished and shall, as to this right be subrogated to any right or claim that the injured or diseased person, his guardian, personal representative, estate, dependents, or survivors has against such third person to the extent of the reasonable value of the care and treatment so furnished or to be furnished. The head of the department or agency of the United States furnishing such care or treatment may also require the injured or diseased person, his guardian, personal representative, estate, dependents, or survivors, as appropriate, to assign his claim or cause of action against the third person to the extent of that right or claim.
Private Hendry’s lawsuit against plaintiff and the settlement thereof does not bar defendant from maintaining its counterclaim. United, States v. Merrigan, 389 F. 3d 21 (3d Cir. 1968); United States v. Wittrock, 268 F. Supp. 325 (E.D. Pa. 1967). 42 U.S.C. § 2651(a) clearly confers an independent right of action on the United States. However, the United States’ recovery may be barred by substantive defenses such as contributory negligence or lack of negligence. United States v. Greene, 266 F. Supp. 976 (N.D. Ill. 1967).
Plaintiff concedes that the amount of $7,460.48 represents the reasonable and necessary medical expenses incurred by defendant in the treatment and care of the injuries sustained by Private Hendry. Since, in the instant case, plaintiff was guilty of negligence by reason of its failure to maintain its power lines in accordance with required standards and to warn defendant of the dangerous condition of its lines, defendant is not barred from recovery on the ground of lack of negligence. But, in this case, defendant was also guilty of negligence in sending military personnel into an unsafe place and having such a disregard for their safety as to not take minimal precautions required by this permit, or that a reasonable person would have taken under similar circumstances. Therefore, defendant is barred from any recovery on its counterclaim.
*732 Summary
In summary, on the basis of the aforegoing and the evidence in tbe record considered as a whole, it is concluded and found that: (1) the permit in question represented the final agreement of the parties and did not include an indemnity provision; (2) defendant never agreed to indemnify plaintiff for damages arising out of accidents such as the one of concern here involving negligence on the part of plaintiff; (3) there was no mutual mistake made by the parties, either as to the legal effect of the applicable law or as to their intentions with respect to the inclusion of an indemnity provision in the permit agreement actually entered into and signed by the parties; (4) Col. Peacock did not have the authority to make any binding representations that an indemnity provision would be included in the permit; and (5) plaintiff did not rely on any such representations as were made with respect to the inclusion of an indemnity provision in this permit prior to the time it was signed by the parties. Therefore, reformation of this permit is inappropriate and is denied.
It is further concluded and found that: (1) defendant failed to comply with certain conditions contained in the permit agreement in question, and observe precautions required thereby; (2) plaintiff’s power line involved here was below the minimum height required by statute and by contract (both plaintiff’s right-of-way license and this permit); (3) the failure by defendant to observe these precautions and the failure by plaintiff to maintain this line at the proper and required height, and to warn persons of this condition, constituted negligence on the part of both parties; and (4) the said negligent acts of the parties are inseparable and, together, constituted the direct and proximate cause of the injuries Private Hendry sustained when the antenna attached to the radio he was carrying came into contact with the low line in question. Therefore, plaintiff is not entitled to recover damages on its breach of contract claim, and defendant is not entitled to recover on its counterclaim for the medical expenses it incurred and paid for the care of Private Hendry.
*733 Since, for the aforesaid reasons, plaintiff is not entitled to recover on its claim under any of the theories asserted as a basis therefor, and defendant is not entitled to recover on its counterclaim, both plaintiff’s petition and defendant’s counterclaim should be dismissed.
FiNDiNos or Fact
1. Plaintiff is a public utility incorporated and existing under the laws of the State of California, with its principal office at 550 California Street, San Francisco, California. Plaintiff is the successor, by statutory merger, to the Needles Gas and Electric Company, a California corporation, and is licensed to do business in the State of Nevada, as well as the State of California.
2. Plaintiff instituted the instant action in this court by filing a petition on December 4,1967, pursuant to the provisions of Title 28, Section 1491, United States Code.
3. Plaintiff was insured on May 18, 1964, the critical date involved in this suit. Plaintiff’s insurers paid the moneys claimed in this suit. In view of this fact, while the record does not specifically disclose that the insurance carriers are sub-rogated to plaintiff’s rights as asserted by plaintiff, it may be reasonably assumed that the insurers are the real parties in interest herein.
4. (a) Under date of November 18, 1938, plaintiff, pursuant to section 5(d) of the Boulder Canyon Project Act of December 21, 1928, 45 Stat. 1057, made application for certain rights-of-way covering specified public lands located between Boulder Dam and Needles, California. The requested right-of-way was granted, and under the provisions of paragraph 26 of an agreement dated October 29, 1939, approved by the then Secretary of the Interior, plaintiff was granted express permission to construct, operate, and maintain electric power lines thereon for the transmission of electricity generated at Boulder Dam. This agreement between plaintiff and defendant has been periodically renewed.
(b). Plaintiff constructed, maintained, and used electric power transmission lines on certain of the rights-of-way *734 granted, including, among other facilities, three high tension lines strung between two poles, one designated 45-1 and the other 45-2. Both of these poles were 50 feet in height and set in an area of land, which includes elevated ground known as “Black Hill.” All of the rights-of-way land area of immediate concern here is located on the west side of U.S. Highway 95, which runs generally south from Searchlight, Nevada, to Needles, California, and passes the east side base of Black Hill at a point about 3 miles south of Searchlight. Pole 45-1 was situated on flat ground at the base of Black Hill near said highway at a point 1,050 feet south of pole 45-2 which was located about halfway up Black Hill. The lines between these two poles were strung in the form of a triangle, the center line being about 4 or 5 feet higher than the two other lines which paralleled each other at a distance apart of approximately 10 feet. The parallel line nearest Highway 95 is referred to as the east line and the other one as the west line.
(c). On November 17, 1944, the president of plaintiff corporation executed a certificate attesting to the asserted fact that all of plaintiff’s transmission lines were constructed in accordance with the requirements of the Boulder Canyon Project Act relating to the granting of rights-of-way and easements over public lands. (See 43 C.F.E. § 2234.1-4(b) (1) partially quoted in finding 5 (e), infra.)
5. (a) Plaintiff’s right-of-way was granted pursuant to Department of Interior regulations codified as 43 C.F.K.. § 2234.1, et seq.
(b). Section 2234.1-1 (a) of Subpart 2234 entitled, “Rights-of-way,” Ch. 11, Title 43 Code of Federal Regulations (C.F.R.), revised as of January 1, 1969, reads in pertinent part:
(a) Scope. (1) This section applies to all rights-of-way covered by §8 2234.1-1 to 2234.1-6; * * * 2234.4-1; 2234.4-2 * * *.
(c). Section 2234.1-2 of said subpart reads in pertinent part:
(a) Application. (1) The application * * * should be in typewritten form or legible handwriting. It must specify that it is made pursuant to the regulations in this part and that the applicant agrees that the right-of-way if approved, will be subject to the *735 terms and conditions of the applicable regulations contained in this part. It should also cite the act to be invoked and state the primary purpose for which the right-of-way is to be used. * * *
(d). Section 2234.1-3 of said Subpart reads in pertinent part:
(а) Nature- of interest granted; settlement on right-of-way; rights of ingress and egress. (1) No interest granted by the regulations in this part shall give the holder thereof any estate of any land in fee in the lands. The interest granted shall consist of an easement, license, or permit in accordance with the terms of the applicable statute; no interest shall be greater than a permit revocable at the discretion of the authorized officer unless the applicable statute provides otherwise. Unless a specific statute or regulation provides otherwise, no interest granted shall give the grantee any right whatever to take from the public lands or reservations any material, earth, or stone for construction or other purpose, but stone and earth necessarily removed from the right-of-way in the construction of a project may be used elsewhere along the same right-of-way in the construction of the same project.
Jjí ^ if:
(c) * * * (1) To comply with State and Federal laws applicable to the project for which the right-of-way is approved, and to the lands which are included in the right-of-way, and lawful existing regulations thereunder.
if: :f: jJ?
(б) To pay the United States the full value for all damages to the lands or other property of the United States caused by him or by his employees, contractors, or employees of the contractors, and to indemnify the United States against any liability for damages to life, person or property arising from the occupancy or use of the lands under the right-of-way, except that where a right-of-way is granted hereunder to a State or other governmental agency which has no legal power to assume such a liability with respect to damages caused by it to lands or property, such agency in lieu thereof agrees to repair all such damages.
*736 (8) To comply with such other specified conditions, within the scope of the applicable statute and lawful regulations thereunder, with respect to the occupancy and use of the lands as may be found by the agency having supervision of the lands to be necessary as a condition to the approval of the right-of-way in order to render its use compatible with the public interest.
(e). Section 2234.1-4 (b) (1) of said Subpart reads in pertinent part:
(b) Use of right-of-way. (1) Proof of construction. * * * Upon completion of construction, proof thereof should be submitted to the manager, consisting of a statement and certificate furnished by the holder of the right-of-way. The statement and certificate are embodied in Forms 5 and 6, Appendix B, which should be modified so as to be appropriate to the act and to the nature of the project. * * *
(f). Section 2234.4, captioned “For * * *, transmission lines * * and more specifically section 2234.4-1 (c) of said Subpart reads in pertinent part:
(c) Terms and conditions. By accepting a right-of-way for a power transmission line, the applicant thereby agrees and consents to comply with and be bound by the following terms and conditions, excepting those which the Secretary may waive in a particular case, in addition to those specified in § 2234.1-3 (c).
(1) To protect in a workmanlike manner, at crossings and at places in proximity to his transmission lines on the right-of-way authorized, in accordance with the rules 'prescribed in the National Electric Safety Code, all Government and other telephone, telegraph, and power transmission lines from contact, and all highways and railroads from obstruction, and to maintain his transmission lines in such manner as not to menace life or property. [Emphasis added]
*****
(g). Section 2234.4r-2, captioned “Boulder Canyon Project,” of said Subpart reads :
Section 5(d) of the Boulder Canyon Project Act of December 21, 1928 (45 Stat. 1057; 43 U.S.C. 6l7d), authorizes the use by any agency receiving a contract for the purchase of electrical energy from Boulder Canyon Project of such public and reserved *737 lands of the United States as may be necessary or convenient for the construction, operation, and maintenance of main transmission lines to transmit said electrical energy.
6. Plaintiff’s right-of-way was also governed by a contract entered into between it and the United States Government dated December 31,1962. This contract merely granted plaintiff a license to construct, install, operate, maintain, replace, or repair its facilities upon property of the United States under the administrative control and jurisdiction of the Bureau of Eeclamation. The aforesaid contract provided in pertinent part as follows:
* * * United States, its officers, agents, and employees, or any of them, shall not be liable for any claims, demands, costs, losses, causes of action, damages, or liability of whatsoever kind or nature, arising out of or resulting from the construction, operation, and maintenance of the facilities of Contractor hereunder.
7. Sometime in September or October 1963, the U.S. Strike Command, composed of U.S. Army and Air Force troops, commenced implementation of plans for the conduct of a joint military maneuver known as “Exercise DESERT STRIKE” (hereinafter sometimes referred to as the “maneuver” or “exercise”), using about 12 million acres of land generally located in the desert area along the borders of the States of California, Utah, and Arizona. More specifically, this acreage extended roughly from Barstow, California, on the west to approximately 100 miles more into the State of Arizona on the east, and from about Baker, California, on the north to Blythe, California, on the south, and included an 'area in the vicinity of Searchlight, Nevada.
8. About 6 months before the commencement of the military maneuver in May 1964, Col. Earl G. Peacock, then and at all times material here, a regular Army officer in the U.S. Army Corps of Engineers assigned as District Engineer of the U.S. Army Engineer District with headquarters in Los Angeles, California (now retired), first became involved in the planned “Desert Strike” military exercise. At that time Col. Peacock, in compliance with a request made by the Com *738 ma/nding General of the Sixth. Army, met with command personnel of the U.S. Strike Command Headquarters at Tampa, Florida, for the purpose of formulating plans for the Los Angeles District to provide certain logistical support in the form of real estate acquisition permits from the legal holders of the land desired by the Government for use in the military maneuver. Col. Peacock, as the District Engineer of the Los Angeles District, was in charge of the District and from 900 to 1,100 civilian employees assigned thereto.
9. The Los Angeles Engineer District was given the mission of arranging for the use of the land required for purposes of the planned military maneuver. Col. Peacock was the person charged with the responsibility of making necessary arrangements on behalf of the Government to obtain rights required to use the land needed for purposes of the maneuver and he was given what he considered unlimited authority to take all proper actions necessary to enable him to carry out the mission assigned to him.
10. Col. Peacock, ¡as the contracting officer for the Los Angeles District and the person designated to acquire necessary land access and use rights, was authorized, among other things, to rent the lands but he desired to obtain the right to use the lands without cost to the Government. Accordingly, on the advice of legal counsel for the Los Angeles District, Col. Peacock decided to have maneuver permit forms prepared for use in securing permission for the Government to use acreage for purposes of the military exercise without monetary consideration having to be paid to the landowners by the Government. Col. Peacock and other personnel authorized to act in his behalf entered into agreements for the Government to pay rental on some lands and facilities in the maneuver area, but this was limited to acreage where the military set up camp, or rented buildings at air field facilities for administrative purposes. No rental was paid for lands in the maneuver area on which the military exercise was actually held or might be held.
11. Sometime along in September or October of 196$, representatives of the Strike Command came to the headquarters office of the Los Angeles Engineer District and re *739 quested assistance in reconnoitering the desert area in order to size up the dangers involved in holding “Desert Strike” in the area contemplated. The Los Angeles District made manpower and information available to these representatives to help them in working up their plans for the exercise, defining the actual areas to be used, and setting off-limits for towns and built-up areas. After a reconnaissance, in furtherance of the planned military exercise the Los Angeles District undertook to notify land owners and others who had property in the area of the planned maneuver and sought information from these persons with respect to their facilities, as one of the steps in obtaining maneuver permits.
12. Along in November or early in December 1963, the Los Angeles District Engineer’s office received its first directive to commence acquiring maneuver permits. Thereafter, about 4,400 owners and others holding a legal interest in the land and property in the area were contacted and maneuver permits obtained from them. Col. Peacock decided, after consultation with Jacob S. Greenfield, the Los Angeles District Counsel, that efforts should be made to obtain permits from not only owners of the lands but all persons and corporations having any interest therein involving fee ownership, such as leasees, renters, licensees, permittees, and holders of easements and rights-of-way relating to the lands.[1] No distinction was made between lands owned by the Government and lands owned by others. In the case of plaintiff, Col. Peacock decided, after considering legal advice expressed by Mr. Greenfield, that its existing rights previously obtained from the Government took precedence over the maneuver as intended by the military and that, therefore, an easement from plaintiff was needed.
13. The maneuver permit forms were drafted by personnel assigned to the Los Angeles Engineer District, acting under the direction and supervision of Col. Peacock. After the forms were reviewed by the District legal officer and *740 thereafter finalized by Col. Peacock, he went over them with the Commanding General of the Sixth Army and the Director of the “Desert Strike” exercise, who gave at least their tacit consent to the use thereof by Col. Peacock, as well as persons acting under delegated authority from him in negotiating desired land and facilities use-agreements. Two basic types of permit forms were prepared.. One was a rather simple permit which was used in obtaining permission from a small landholder to go over his property, and it provided that the Government would restore the property in the event of damages. The other type of form was more detailed, and it was used in securing rights to use the land and/or facilities of railroad and utility companies. Neither of these two types of forms, nor any other maneuver permit obtained from a person or corporation, included an indemnity clause. (See finding23 (b).)
14. The routine work of preparing specific maneuver permits and mailing them to the landholders concerned was not performed by Col. Peacock but rather by personnel in the Real Estate and Legal Divisions of the Los Angeles District Engineer’s office, acting under delegated authority from him. If the landholder signed and returned the permit to the District office, Col. Peacock did not become personally involved in the negotiations with the landholder for an easement, or other type of land use agreement. He entered the picture only in those relatively few instances where at least two unsuccessful attempts had been made to obtain the requested use rights. After two or more refusals, Col. Peacock personally interceded with the land owner, holder, or other appropriate person in an effort to secure the use rights desired by way of a maneuver permit.
15. In 'addition to Col. Peacock, the principal military and civilian personnel of the Los Angeles Engineer District authorized to negotiate and sign the maneuver permits on behalf of the United States Government included, among a few other unidentified persons assigned to the Eeal Estate Division of the Los Angeles Engineer District, Lt. Col. A. R. Marshall, the Deputy District Engineer of the Los An-geles Engineer District; John Houston, the permanent As *741 sistant Chief of the Keal Estate Division who was Acting Chief of said Division from February 23, 1964, to the end of April 1964; and Mr. Jacob S. Greenfield, District Counsel, a civilian regularly employed on a full-time basis as legal officer for the District. Col. Peacock designated and authorized all of the above-mentioned individuals to sign maneuver permits, and they unquestionably operated under such delegated authority from Col. Peacock. Because of the magnitude of the responsibility of the Keal Estate Division in conducting this operation, it was necessary for said Division to obtain assistance from other Divisions, and Messrs. Sam Ackerman and O. E. Gurney, among others, were borrowed from the Engineering Division to assist in procuring access rights. From 8 to 10 persons, including Messrs. Acker-man and Gurney, worked full time on this matter under the immediate supervision and direction of Mr. Houston, who reported directly to Col. Peacock.
16. (a) In connection with the actions taken by the Los Angeles Engineer District to notify land owners and others who had property in the area of the maneuver, and to secure detailed information concerning their specific facilities, Lt. Col. Marshall (identified in finding 15) sent to plaintiff’s office in Needles, California, for the attention of Mr. Lowell J. Kays, the District Manager, a letter dated March 9,1964, which reads in pertinent part:
* * * the U. S. Strike Command * * * is planning a joint maneuver * * * within the area indicated on attached map. * * *
Your company has electrical power facilities within the maneuver area. Every effort will be made to protect your facilities and avoid damage in crossing your property and right-of-way. Any damage attributable to the maneuver will be promptly repaired or reimbursement made in lieu thereof.
To facilitate the maneuver forces’ planning program, information is requested relative to where crossings can be safely made over your facilities. Such information should include their location within the maneuver area, depth of cover over buried cable, type of encasement, if any, and extent of aerial cable, with the minimum height above ground and the voltage. A copy of inclosed *742 map may be used for this purpose. Please include name, address, and emergency telephone number to call in case of damage to your facilities.
We also request that you grant permission of entry upon your rights-of-way for maneuver purposes. Attached is a copy of a proposed permit, similar to one used in maneuvers elsewhere, which you may use as a sample in formulating a permit for execution. Additional information may be obtained from S. M. Acker-man or O.E. Gurney of this office * * *.
You will render valuable assistance to the success of the maneuver and aid in our country’s military preparedness efforts by granting the above requests.
(b). On the same date, Lt. Col. Marshall sent another letter to plaintiff’s office at Searchlight, Nevada, for the attention of Mr. Carl Myers, the local agent in charge of the Searchlight Division. This letter contained, among other statements irrelevant here, the identical language quoted in (a), above. It should be noted that both of these letters indicated that a draft copy of a proposed permit and a copy of a map identified as No. 33-M-5 were enclosed at attachments thereto.
(c). Both of the letters mentioned in (a) and (b), above, were prepared in the office of Mr. John Houston, then Acting Chief of the Eeal Estate Division of the Los Angeles Engineer District. After approval thereof by Mr. Houston, the letters were sent to the office of Col. Peacock where they were signed by Lt. Col. Marshall on behalf of Col. Peacock, under delegated authority from and with the latter’s knowledge.
17. The record does not disclose that either of the March 9, 1964 letters (mentioned in finding 16(a) and (b)) was acknowledged in writing by the addressees thereof, i.e., Messrs. Kays and Myers, or by any other person employed by plaintiff. Nor is there any evidence that plaintiff ever returned to the Government a copy of the map mentioned in the third paragraph of the letters with the information requested therein noted on the map.[2] It may be reasonably *743 assumed that Messrs. Kays and Myers forwarded the letters, together with the copy of the proposed draft permit and map enclosed therewith, to other personnel of plaintiff for consideration. In any event, it is quite clear that officials of plaintiff had objections to the proposed permit and orally voiced them to Government representatives, which partially explains plaintiff’s failure to acknowledge the letters in writing and to furnish the information requested therein.
18. As to the objections plaintiff had to the proposed permit, the evidence shows that on March 17,1964, Mr. H. C. Bright, employed by plaintiff as a telephone engineer, had a telephone conversation with Mr. O. E. Gurney of the Los Angeles Engineer District, during which Mr. Bright referred to the fact that the permit did not contain a “save harmless” clause, and requested that it be revised to include an indemnification provision that would protect plaintiff against third-party claims for damages, injuries, and deaths. Mr. Gurney indicated that this would be done and a revised permit submitted to plaintiff for further consideration. Thereafter, a letter dated March 19, 1964, and signed by Col. Peacock, was sent to the headquarters office of plaintiff corporation in San Francisco, California, for the attention of Mr. L. E. Cooper, Vice President and Chief Engineer. The letter reads in pertinent part:
As discussed in telephone conversation 17 March 1964 between your Mr. H. C. Bright and Mr. O. E. Gurney of this office relative to your granting the Government permission to cross your rights-of-way and to attach Army communication wires to your pole lines within the maneuver area shown on the attached map, the following is submitted for your information.
As stated in letters sent to your Mr. Kay [sic] at Needles, California, and Mr. Meyers [sic] at Searchlight, Nevada, the U.S. Strike Command, composed of ÍJ.S. Army and Air Force troops, is planning a maneuver to be known as Exercise DESEKT STRIKE, within the maneuver area. * * *
In our basic letters to your Needles and Searchlight offices we requested information relative to location, minimum height above ground, and voltage of your *744 aerial utilities, with the name, address and emergency phone number to call in case of damage to your facilities.
We are inclosing a permit for your signature to grant the Government entry upon your right-of-way and permission to attach U.S. Army communication wires to your poles. The inclosed permit has an added provision, as requested, by Mr. Bright, relatwe to claims against ypv/r Company for damages, injuries or deaths. This provision was not included m the draft of permit sent to yowr Needles and Searchlight offices. [Emphasis added][3]
19k Upon review of the revised permit presumably enclosed with Col. Peacock’s March 19, 1964 letter (partially quoted in finding 18), certain officials and personnel of plaintiff still had objections thereto, and remained unconvinced that the added provision contained therein relating to claims against plaintiff for damages, injuries, and deaths, which had not been included in the proposed permit initially submitted to plaintiff, afforded plaintiff the protection it desired. Accordingly, Mr. A. B. Gilbertson, employed by plaintiff as a supervisory engineer in its headquarters office, discussed plaintiff’s abjections on the telephone with unidentified representatives of the Los Angeles District on several occasions and requested that a number of additional provisions, including an indemnity clause that would protect and save harmless the plaintiff against all future third-party claims for damages, be incorporated in the permit. Since the Government was either unwilling, or found itself unable, to meet all of the objections raised by plaintiff and would not agree to revise the permit in all respects requested 'by plaintiff, the latter refused to sign a permit agreement.
20. As previously stated (finding 14), Col. Peacock’s policy ¡and practice was not to personally participate in negotiations for access permit agreements unless serious difficulty was encountered by other Government personnel in securing a particular permit. While the record is not entirely clear, it does not appear that Col. Peacock became involved in the efforts to Obtain a permit from plaintiff prior to the time of *745 the discussion Mr. Bright had with Mr. Gurney on March 17, 1964 (finding 18), and probably not until after the telephone discussions Mr. Gilbertson had with Government representatives subsequent to March 19, 1964 (finding 19). Thereafter, because of the trouble the Government was having in reaching an agreement with plaintiff on an access permit mutually acceptable to plaintiff and defendant, Gal. Peacock personally entered into the negotiations with plaintiff and had some discussions with Mr. Cooper (identified in finding 18), concerning the objections voiced to the proposed permit enclosed with Col. Peacock’s March 19, 1964 letter (finding 18), and also talked with other employees of plaintiff company on the telephone and in the desert.[4]
21. After the discussions between Mr. Gilbertson and Government representatives (finding 19), and between Mr. Cooper and Col. Peacock (finding 20, n. 4), the permit enclosed with the latter’s March 19, 1964 letter to plaintiff (finding 18) was changed again, and a revised draft was sent to plaintiff with a transmittal letter dated March 27, 1964, and signed by Col. Peacock, which reads in part:
Reference is made to our letter dated 19 March 1964 and subsequent telephonic discussion between your Mr. C. Gilbertson and representative of this office relative to right-of-way crossing permit in connection with a joint Army and Air Force exercise * * *.
As discussed in telephonic conversation, the proposed permit has been revised to include the following:
(a) Tie down of antennas;
(b) Restriction as to crossing 4-inch gas line East of Needles;
(c) Pole line clearances to be in accordance with National Electric Code in Nevada and GO #95 in California, and
*746 (d) Vehicles and tanks will not cross under wires closer than 25 feet or farther than 50 feet from a pole.
Paragraph 8 has been added to the permit to provide for California Pacific Utilities Co. as owner of the permitted premises to implead the United States as a third party (defendant. This addition is necessary because no authority exists whereby the Government can be bound to an agreement indemnifying a party against future damage. Based on provision of 31 USC 665, the courts have consistently ruled that clauses relating to indemnification for future damage cannot be entered into on behalf of the United States.
It will be noted particularly that Col. Peacock referred to the fact that a new Paragraph 8 had been added to the permit enclosed with his letter and explained the reason therefor. Col. Peacock testified that the language explaining the reason for adding this new paragraph was prepared by the Los Angeles District Counsel, who advised him on all legal matters and reviewed all contracts and permits before he (Peacock) approved and signed them.
22. (a) As best it can be determined from a confused record, the permit enclosed with Col. Peacock’s March 27, 1964 letter (partially quoted in finding 21) was again revised to include additional language and provisions suggested by plaintiff’s personnel before it was signed by either plaintiff or defendant. It is impossible to say with certainty but it appears most likely that the final version of the permit was prepared by plaintiff’s personnel, signed on behalf of plaintiff, and then sent to defendant for signature. In any event, the permit agreement is in the form of an undated letter addressed to the District Engineer, U.S. Army Engineer District, Los Angeles. The letter permit was approved, agreed to, and signed by Mr. E. K. Albert, President of California Pacific Utilities Company, on March 30,1964, and on behalf of the Government by Mr. John Houston, Acting Chief, Real Estate Division, of the above-stated District, on April 1, 1964. The signed permit (Plf’s. Exhibit 1) reads in part:
AS AN ACCOMMODATION AND WITHOUT COMPENSATION THEREFOR, CALIFORNIA PACIFIC UTILITY COMPANY * * * grants to *747 the United States of America * * * a maneuver permit on Company property * * * upon the following terms and conditions:
PART I — LAND BIGHTS
1. The Company hereby grants to the Government the right to enter as often as desired upon the lands and rights-of-way of said Company during the period 15 April-15 June 1964, in order that the United States Armed Forces personnel engaged in special Field Exercises, with their animals, vehicles and equipment, may enter, travel, maneuver upon, erect temporarily communication centers, construct bridges, land airplanes and helicopters, air drop personnel and equipment, pass over, dig shallow trenches,_ and bivouac or camp upon Company land, subject to tie down of radio antennas on all vehicles, equipment and tanks * * *.
2. It is particularly understood and agreed that the the Government shall reimburse the Company or tenant of the Company for the damage of any property, or in lieu of reimbursement the Government shall repair, replace, and restore to former condition any and/or all damage of whatever nature that may directly result from the Government’s exercise of the rights granted herein.
3. During the maneuver period, 15 April-15 June 1964, and not later than one (1) year thereafter, the Company or its tenants will report any and all damages resulting from the Government’s exercise of the rights granted herein. The report of damages will be made to the District Engineer, U.S. Army Engineer District, Los Angeles * * *.
* * * * *
PART II — FACILITY RIGHTS
It is the policy of this Company not to allow any person to climb its poles who is not an experienced lineman and who does not know and appreciate the danger of coming in contact with, or working in close proximity to wires energized with voltages at which electricity is transmitted for public use. This rule is predicated upon the fact that the Company desires to avoid the chance of persons being injured and to prevent the likelihood of injury to our lines, or the interruption of service to our customers.
Being desirous of cooperating with the Armed Forces of the Government in its DESERT STRIKE maneu *748 vers, the Company agrees that the Armed Forces may extend communication lines over and across Company’s transmission lines rights-of-way under the following conditions:
1. That all clearances will be observed as provided in the last publication of the National Electrical Oode for use in Glarh County, Nevada, and General Order No. 95 for use in the State of California. [Emphasis added]
2. That in case of damage to any line or pole, causing any outage, the Company’s office in the area will be promptly notified so that it may restore service and make the necessary repairs with the least inconvenience to the public, and the Company shall be reimbursed by the Government for all expenses incurred by the Company in restoring service and making such repairs.
8. That J-hooks, or tying wire or other adequate devices, may be used for fastening any of the Armed Forces communication wires to the Company’s poles. That vehicles, tanks, trucks, crossing under electric lines will cross between minimum 25 and maximum 50 feet from any pole. [Emphasis added]
* # * * *
7. The Company, its officers or employees, shall not be responsible for claims, demands, actions, or causes of actions arising or growing out of loss of damage to property or injury to or death of persons resulting from acts or omissions of any of the officers, agents, or employees of the Government.[5]
8. The parties agree that if any civil cause of action for money damages, for injury or loss of property, or personal injury or death, is brought against the owner of the permitted premises concerning which the owner claims that the United States is liable under the Federal Tort Claims Act (Act of June 25, 1948, as amended), the owner may petition for removal of the cause of action to a United States District Court if such action is brought in any other court, and that the United States be impleaded as a third party defendant in such action.
(b) There is no dispute between the parties that Paragraph 8 under PART II of the above partially quoted permit *749 agreement contains the same language as the new Paragraph 8 added to the proposed revised permit attached to Col. Peacock’s March 27,1964 letter to plaintiff, in which he referred to and explained said new paragraph. (Finding 21.)
23. (a) As previously stated (finding 15), Mr. Houston, who signed the letter-permit agreement on behalf of the Government (finding 22), was authorized to do so under delegated authority from Col. Peacock. The letters of March 9, 1964, signed by Lt. Col. Marshall (finding 16(a) and (b)), and the March 19,19641etter signed by Col. Peacock (finding 18), were prepared in Mr. Houston’s office. Mr. Houston presented credible testimony at the trial to the effect that he never authorized anyone under his supervision and direction to make any oral representations other than those contained in the letter permit signed by him; and that the permit accurately reflects his intentions with respect to the rights, duties, and responsibilities of the parties at the time he signed it.
(b) In January 1964, Southern Pacific Land Company proposed to the Keal Estate Division that a certain indemnity clause be included in a permit which the Government was seeking to obtain from that company in connection with the military maneuver involved here. Mr. Houston was aware of the fact that since about 1955, higher authority had consistently instructed the Los Angeles District not to include indemnity clauses in agreements. However, in order to confirm that this prohibition was still in effect, he submitted Southern Pacific Land Company’s proposed indemnity clause to the District Counsel’s office for a current ruling on this matter. Thereafter, Mr. Jacob S. Greenfield, the District Counsel, approved and signed a memorandum for the Chief of the Eeal Estate Division, dated January 29, 1964, which had been prepared in his office. The memorandum reads in part:
1. Pursuant to Mr. Houston’s oral request to Mr. Cur-ran of this office, for review and an opinion as to the acceptability of an indemnity clause proposed by Southern Pacific Land Company * * *:
*750 2. The proposal to indemnify and save harmless the Southern Pacific Land Company against all claims, demands, payments, etc., constitutes an agreement for expenditure of an indeterminate sum of money for which an appropriation or fund is not available. Such agreement is prohibited by Section 665, Title 31 U.S.C.A., which is quoted in pertinent part:
“(a) No officer or employee of the United States shall make or authorize an expenditure from or create or authorize an obligation under any appropriation or fund in excess of the amount available therein; nor shall any such officer or employee involve the Government in any contract or other obligation, for the payment of money for any purpose, m advance of appropriations made for such purpose, unless such contract or obligation is authorized by law * *
Subsection (i) of Section 665, also provides penalties for violations by an officer or employee of the United States, of the above quoted provision.
3. Section 11 of Title 41, which also deals with the same subject, provides in pertinent part, “No contract or purchase on behalf of the United States shall be made unless the same is authorized by law and adequate to its fulfillment * *
4. The Comptroller General has also ruled on this subject in his decision disapproving indemnity provisions as being indefinite and of unlimited character, in the absence of express statutory authority therefor. (35 C.G. 85).
5. It is noted the Southern Pacific Land Company attempts to limit the indemnification by addition of the provision that the indemnification is only, insofar as the Government may legally indemnify under the Tort Claims Act (28 USCA 2671, et seq.). The Tort Claims Act provides for legal liability by the United States and for settlement of tort claims against the United States. Determination whether the United States is liable, in any case, must, of course, be made by judgment of the Court or by way of the limited administrative authority contained in the act. To accept the provision proposed by the Southern Pacific Land Company, even with the limitation above referred to, in my opinion, constitutes an agreement of indemnity, prohibited by the provisions of Titles 41 and 31, as above set forth and, also, an agreement which could preclude joining the *751 Southern Pacific Land Company as a joint Tort-feasor, liable with the United States for payment of a damage claim.
6. Accordingly, it is my opinion that the indemnity provision, provided in referenced letter, is unacceptable, and in lieu thereof it is suggested that the Southern Pacific Land Company be requested to substitute the provision for joinder of the United States and, removal to the Federal Court of actions filed against it. This provision was heretofore approved by OCE and authorized for use by your Leasing Section, in lieu of indemnity provisions. Your Mr. Wilkinson is familiar with this clause.
Undoubtedly, Mr. Houston had the above opinion in mind at the time he signed the letter-permit agreemént involved in the instant case, and it is clear from the record that the kind of an indemnity clause desired by plaintiff, which presumably was substantially similar to the one proposed by Southern Pacific Land Company, was not unintentionally left out of the permit signed by the parties, as a result of error or inadvertence.
24. (a) Plaintiff strongly disputes defendant’s position that the permit signed by the parties (finding 22) represented the final agreement between the parties, plaintiff contending, among other things, that, as a matter of fact, Col. Peacock and other Army personnel concerned with obtaining maneuver permits made certain representations and commitments, both orally and in writing, during the course of negotiations for the permit in question, as well as for permits secured from other landholders, with respect to the Government compensating or reimbursing plaintiff and other permittors for any and all damages sustained by them as a result of the military exercise, regardless of the circumstances; that plaintiff relied on such representations and commitments when it signed the permit agreement; that the wording of the permit, itself, should be properly interpreted to mean that the Government agreed to indemnify or reimburse plaintiff for all damages and that notwithstanding defendant’s interpretation to the contrary, it was understood and intended by both the plaintiff and the Army that paragraph 8 *752 of the permit (finding 22(a)) be an indemnity clause and treated as such; that Col. Peacock was the contracting officer and had the authority to make the representations assertedly made by him and to bind the Army thereto; that said paragraph 8 was included in the permit as a result of a misunderstanding of the law on the part of both plaintiff and defendant; and that in view of the foregoing, the contract should be reformed to reflect the asserted true intention of the parties at the time they entered into the permit agreement, by inserting therein a hold harmless or indemnity clause in place of the so-called third-party clause, i.e., paragraph 8 of the permit.
(b) While certain testimony underlying some of plaintiff’s aforestated contentions, when considered out of contest, appear to confirm such contentions, either wholly or partially in varying degree, it is concluded that none of these contentions are supported by acceptable evidence in the record considered as a whole and/or are irrelevant and immaterial; therefore, findings proposed by plaintiff along these lines are rejected. The reasons for such action are apparent from the facts contained in a series of findings that follow. (See findings 25 to 34, inch, infra.)
25. Col. Peacock testified at length and in detail concerning, among other things, the oral statements and representations he and other military and Government personnel made to landholders, generally, and to plaintiff’s personnel, including Mr. Cooper (finding 20), during the course of negotiations for permits from landholders and, particularly, the permit agreement entered into by plaintiff and the Government involved here; the subject matter of the discussions and conversations that took place between plaintiff’s personnel and himself; the contents of correspondence between his office and plaintiff; and the intentions, understandings, and views he had as to the nature, kind, and extent of the commitments he made on ’behalf of the Government, and the responsibilities and obligations which the Government assumed, with respect to the payment of damages arising out of the maneuver, when the permit was obtained from plaintiff, as well as the source and scope of his authority to settle damage *753 claims. Considerable difficulty bas been encountered in making proper findings of facts based on or related to testimony presented by Col. Peacock, because it is in some respects conflicting with other testimony and documentary evidence in the record, contradictory, inconsistent, illogical, unclear, incredible, and obviously generally sympathetic to plaintiff’s claim. Furthermore, Col. Peacock’s testimony shows that he did not know, have in mind, and consider all essential factors when he admittedly made certain representations to plaintiff and other landholders, and really did not intend to commit the Government to pay damages to the extent indicated by a literal application of the words used by him. Keeping the foregoing in mind, the facts that follow, relating to the permit signed by the parties, are found on the basis of not only the credible testimony presented by Col. Peacock but also all of the acceptable testimony and other evidence in the record considered in its entirety.
26. Prior to and in the early stages of actual negotiations with landholders for land agreements and maneuver permits, General Frederick Brown, the Commanding General of the Sixth Army, as the designated representative of the Strike Command, and Col. Peacock, as the Los Angeles District Engineer and representative of the Chief of the Corps of Engineers, visited various communities in the maneuver area and made public talks for the purpose of educating people about the planned maneuvers as part of the effort to persuade landholders to sign maneuver permits. During these appearances, both Col. Peacock and General Brown made statements, among others, to the effect that “[t]he purpose of the permit was to compensate them [the landholders] for any damages regardless of the circumstances if it was related to the actions of the United States troops on * * * the DESEB.T STBIKE maneuver or connected with the maneuver in any way”; and Col. Peacock personally made statements of such nature to the landholders at the time he persuaded them to sign the permits. Col. Peacock and General Brown made these statements because they anticipated there would be many damage claims and questions of an unfor-seeable nature, and considered it advisable to use broad all- *754 encompassing language in order to forestall a myriad of possible questions, and to allay any fears tbe landholders might have about signing a permit. Col. Peacock made substantially the same statements and representations to some officials and employees of plaintiff at one time or the other during the time he personally participated in the negotiations for a permit from plaintiff.
27. As previously mentioned briefly (finding 20), Col. Peacock talked with Mr. Cooper on the telephone about plaintiff allowing the Government to use plaintiff’s rights-of-way and facilities for maneuver purposes. Mr. Cooper testified at the trial, and his recollections as to the number of times he talked with Col. Peacock, the kinds of damages that were discussed, the statements and representations made by Col. Peacock, and the understandings reached as a result of their conversations vary in certain respects from those of Col. Peacock. The latter initiated the first telephone conversation he had with Mr. Cooper and advised him that he had gone over the objections raised by plaintiff to the proposed permit previously submitted to the company for consideration; and that despite these objections, it would be in the best interests of plaintiff to sign the permit because this would give him (Peacock) the opportunity of paying, on behalf of the Government, for any damages to plaintiff’s property and facilities arising directly out of the maneuvers.
When Mr. Cooper raised the question of third-party damage claims, which some of plaintiff’s personnel had discussed with other Government representatives, Col. Peacock assured him that such damage claims would be paid by him. Mr. Cooper and Col. Peacock then had a discussion as to what a third-party damage claim involved during which the latter agreed, for an example, that the Government would reimburse plaintiff for loss of revenues resulting from damage to plaintiff’s power lines to such an extent that its customers could not be serviced.
Subsequent to the first above-mentioned conversation, Col. Peacock and Mr. Cooper had other talks on the telephone during which they discussed various aspects of damage claims that might arise out of the maneuver, including third- *755 party claims; however, the only example of a third-party claim that was ever used was the one mentioned earlier involving loss of revenue due to interruption of service, and Col. Peacock simply repeated the assurances which he had previously given to Mr. Cooper that the Government would compensate plaintiff for any damages to its property and facilities that might result from the maneuver activities.
28. (a) Subsequent to the accident involved in this case, Col. Peacock retired from the U.S. Army Corps of Engineers. Thereafter, he received a letter dated December 10, 1965, from Colonel Thomas H. Swan, Staff Judge Advocate, Headquarters Sixth United States Army, San Francisco, California, concerning the subject “Billy J. Hendry vs. California-Pacific Utilities Company.” In response to this letter, Col. Peacock sent to Colonel Swan a letter dated December 15,1965, which reads in pertinent part:
I am thoroughly familiar with this case and participated personally m obtaining the necessary easements and rights of way from the California-Pacific Utilities Company in connection with operation Desert Strike..In order to obtain approval from the California-Pacific Utilities Company to utilize their property during operation Desert Strike I personally assured them orally that any damages (including damages to a third party) that resulted from the activities of operation Desert Strike would be reimbursable to them from the U.S. Government. If I remember correctly, this information was passed to a Mr. Cooper of the California-Pacific Utilities Company.
Due to the fact that I do not have the current files in my possession I am unable to give you all the particulars, but if I were called to testify under oath, I would have to testify along these lines. Further, in view of the California-Pacific Utilities Company’s reluctance to sign the permit I gave them this assurance, acting in good faith that any damages sustained by them would be reimbursed by the Federal Government. Therefore, it is my feeling that their claim for payment under subject case by the Federal Government is fully justified.
(b). On cross-examination concerning the above-quoted letter, Col. Peacock stated, among other things, that he first became aware of the accident involving Billy Joe Hendry, *756 which, gave rise to the instant case, when he received Col. Swan’s December 10,1965 letter; that he did not know how, or exactly where, the accident happened, or anything whatsoever about it, or the condition of plaintiff’s power lines at the point in the area in which the accident occurred, or what Hendry was doing at the time; that despite his lack of knowledge concerning these things, he based the statement, among others, made in his December 15,1965 reply letter to Col. Swan, that plaintiff’s claim against the United States was fully justified, on what he had told plaintiff at the time the Government obtained the permit in question; and that he had assured plaintiff that he would reimburse it for any accident that happened on their lines, regardless of how it happened or what the condition of their property was at the time it happened. In light of other testimony presented by Col. Peacock on direct and cross-examination, and other testimony and documentary evidence in the record, his above-mentioned testimony as to what he told plaintiff is rejected as incredible.
29. Although the credible testimony of Col. Peacock shows that at the times he made statements along the lines quoted in finding 26 in public talks and discussions with plaintiff’s personnel before the permit was obtained from plaintiff, he primarily had in mind damages to property, such testimony further discloses that he also was thinking of injuries that might be sustained by someone; that he fully intended to pay valid claims for damages arising from personal injuries, as well as for damages to property and facilities, including third-party damages, that occurred as a direct result of maneuver operations; but that, however, he never specifically mentioned or discussed the subject of personal injuries “per se” with plaintiff or other landholders. Col. Peacock clearly represented to plaintiff and orally agreed that the Government would pay any damages, including damages to third parties, involving plaintiff’s property and facilities, and thought he had the authority to make such representations and agreements; however, it is also clear that Col. Peacock did not really know and understand what the term “third-party damage claims” meant or embraced; that he *757 did not consider all factors, circumstances, conditions, and possibilities in forming Ms above-stated intentions and making the representations indicated with respect to the payment of damages; that the possibility did occur to him that soldiers or other military personnel might be injured as a result of coming in contact with plaintiff’s power lines, but that it never occurred to him that the Government would be called upon, or obligated, to pay for such or any other injuries sustained by military personnel engaged in the maneuvers, and that he did not agree to pay damages for such injuries; that his only thought along these lines was that the Army, itself, would take care of injuries sustained by any of the troops participating in the military exercise; that during his talks, negotiations, and discussions with landholders, including plaintiff, it never occurred to Col. Peacock that some injuries might be sustained during the maneuver as a result of their own negligence; and that he never intended or agreed to pay for any damages resulting from negligence on their part or acts of God.
30. Col. Peacock made certain statements of a general nature indicating that some adjustments and reparations were made to unidentified persons by the Army for damages arising as a result of the “Desert Strike” maneuvers and operations. However, there is no testimony or other evidence in the record with respect to the kind or amount of damages sustained by other persons holding interests and rights in property. Nor is there any evidence as to whether or not such persons who sustained and recovered damages had granted similar or identical permits as the one signed by plaintiff.
31. Col. Peacock presented credible testimony to the effect that following his discussions with Mr. Cooper (see findings 18 and 20) and other personnel of plaintiff, he briefed Lt. Col. Marshall, Mr. Houston, and Mr. Greenfield, and told them that in order to obtain a permit from plaintiff, it would have to contain certain provisions; that the permit finally signed was drafted with this in mind and included clauses desired by plaintiff to the extent the drafters of the permit understood and believed they were legally authorized to bind the Government; and that there is nothing in the final version *758 of the permit which, does not express his intentions at the time it was agreed upon and signed by the parties.
32. Mr. Cooper testified that he read the letter sent to him by Col. Peacock under date of March 27, 1964, wherein the latter stated that the Government did not have the authority to enter into an agreement that would legally bind the Government to indemnify a party against future damages; that despite the foregoing, he understood that plaintiff company would be held harmless from any damage claims and suits arising out of injuries sustained by any Army personnel or other third party, regardless of the circumstances. This testimony is rejected as incredible and unsupported by the evidence. Neither Mr. Cooper, personally, nor plaintiff was justified, under the facts and circumstances in the instant case, in believing that plaintiff was protected to any greater extent than that afforded by the terms of the permit agreement, or in relying on any representations, which may have been made by Col. Peacock or other Government representatives, that are not encompassed by provisions actually incorporated in the permit. Mr. Cooper stated that he never consulted plaintiff’s attorney about the permit in question, and that he did not know whether such attorney ever reviewed the permit before it was signed by Mr. Albert on behalf of plaintiff. In this connection, it is noted that Mr. Albert was not called to present testimony at the trial.
33. According to Mr. Cooper, Col. Peacock telephoned him sometime in 1966, indicated that a damage suit had been filed in the Billy Joe Hendry case, advised it was his understanding that plaintiff would be protected from the damage claim in that particular case, and stated he would be willing to testify in favor of such protection. There is no evidence that Col. Peacock is a lawyer or was trained in the law. As previously mentioned, Col. Peacock admittedly did not know anything about the accident, except what he learned much later thereafter from Army sources and counsel for the parties, and he had no knowledge bearing on the facts essential to the resolution of questions concerning negligence on the part of either plaintiff or defendant herein.
*759 34. On. the basis of tlie foregoing findings, particularly findings 25 to 33, inclusive, it is concluded and found, as a matter of fact, that the permit signed on behalf of the plaintiff and defendant on March 30, 1964, and April 1, 1964, respectively (finding 22(a)), together with the explanation of Paragraph 8 under Part II thereof contained in Col. Peacock’s March 27, 1964 letter to plaintiff (finding 21), represented the final agreement between the parties; that at the time the permit agreement was signed by the parties, it was not the intention and understanding of both the Army and plaintiff that the permit obligated the Government to indemnify or reimburse plaintiff for all future damage; that although prior to the time of Col. Peacock’s March 27,1964 letter to plaintiff he thought he had unlimited authority to indemnify plaintiff for all damages and made oral representations to the effect he would do so, it is clear that he did not have such authority, and that he ‘corrected any misrepresentations as to his authority when he wrote said letter, stating therein that no authority existed whereby the Government could be bound to an agreement indemnifying a party against future damages.
35. Operation “Desert Strike” began on May 17,1964. One of the designated aggressor units involved in the maneuver was Company A, First Battalion, Eleventh Infantry, of Fort Carson, Colorado, which company was commanded by Lt. Lowell J. Mayone. Company A left Fort Carson by motor convoy and it bivouacked in an area near Kingman, Arizona. Private Billy Joe Hendry, a radio telephone operator, was a member of this company. On the morning of May 18, 1964, three platoons of the company were airlifted into an area just south and east of Searchlight, Nevada. The assigned objective of Company A was to secure 'the ground comprising Black Hill (mentioned in finding 4(b)). Two of the platoons were transported by helicopter. The third platoon, commanded by a Lt. Charles Hohertz, was transported by fixed-wing aircraft, which landed at an apparently abandoned airstrip located some distance .further south and west of where the helicopters landed. The persons *760 “umpiring” this maneuver activity ruled that the last mentioned platoon had been “killed” or “captured” by a defensive unit, and could not continue to participate in the maneuvers for a certain period of time; but it was given permission to accompany the other two platoons in a passive role. After the three platoons joined forces, the entire Company moved south along the east side of Highway 95 until it was opposite the base of Black Hill. At that point the entire Company crossed Highway 95, went through a barbed wire fence installed on the west side of the road, and entered upon plaintiff’s rights-of-way. The two platoons still actively participating in the exercise first proceeded up said hill in an irregular column formation and the third platoon followed behind. One radio operator was with each of the two active platoons as they walked toward the top of the hill. Lieutenant Mayone was also proceeding up the hill ahead of the third platoon, but he was considerably closer to the base thereof than the men in the two platoons ahead of him. He was having communications problems with these platoons, and sent his radio operator, Private Hendry, up the hill to make personal contact with the radio operators assigned to the two platoons then walking toward the top of the hill.
36. When Private Hendry stairted up Black Hill, he was carrying an AN/PRC/10 radio equipped with an antenna on his shoulders. As Private Hendry was walking under plaintiff’s power lines strung between poles 45-1 and 45-2, the antenna on his radio hit one of these lines at a point thereon determined to be 380 feet south of pole 45-2, causing him to sustain severe electric bums. The accident occurred about 11:30 A.M. on May 18, 1964. The above-identified radio Private Hendry was carrying when this accident occurred, was a field pack model which straps on the back of the person carrying it, and the radio was equipped with an antenna 10 feet long. At the time of the accident, Private Hendry was 5 feet 8 inches in height. The 10-foot antenna on the radio extended about 9% feet over the top of his head. Thus, it is apparent that the antenna could not have extended higher in the air than 15 feet 2 inches.
*761 37. As Private Hendry was walking np Black Hill, he did not see plaintiff’s power lines primarily because he was watching his footing and being careful not to step on any snakes or loose rocks. It may be assumed that he was bent over as he proceeded up the hill, particularly considering the fact that he was carrying a heavy field pack radio on his back, a rifle, and other equipment. Plaintiff’s power lines could be seen from the highway some distance away from the base of the hill and they were customarily visually patrolled by plaintiff’s personnel traveling on the road in motor vehicles. Despite this fact, the evidence indicates that the lines were somewhat difficult to see against the sun and blue sky, especially at certain angles from points on the hill closer to the lines. In any event, all of the military personnel in the immediate vicinity where the accident occurred who testified, except Private Hendry who admitted seeing a pole of some kind near the highway (probably pole 45-1), stated that they did not see either the lines or poles before the accident. There is no evidence that any of these soldiers knew power lines were in the immediate area or were even thinking of such a possibility. Undoubtedly, the fact that they were not looking for the lines and were in a bent-over position as they proceeded up the hill were contributing factors to their failure to observe them.
38. (a) As Private Hendry was starting up the hill ahead of Lt. Mayone, the latter was trying to communicate with Battalion Headquarters on another radio. Consequently, he did not see Private Hendry on the hill until after hearing a loud noise, whereupon he looked up and observed Hendry falling on his back at a point about 25 to 30 yards away from where Lt. Mayone was located near the base of the hill. Lt. Mayone immediately went to Hendry, helped take care of him, and made arrangements to have him evacuated. Lt. Mayone did not see any power lines or poles prior to the accident and could not recall seeing any warning signs or devices indicating high voltage or low power lines.
(b) Starting about a month before the commencement of the military exercise, Lt. Mayone, along with other Company Commanders, was given a series of briefings by his Battalion *762 Commander and maps of tbe terrain in tbe area in wbicb Black Hill was located. The maps showed Black Hill but not any power lines and poles thereon, and he did not see any such facilities on the hill as he passed over it by helicopter en route to the point where it landed near Searchlight, Nevada. During the briefings received by Lt. Mayone, he was orally told not to do some things, but a written list of “Don’ts” was not furnished to him, and he never received instructions of any kind to tie down antennas. The night before the day of the accident, he briefed his company in general terms but they were not directed to tie down radio antennas, or specifically warned about power lines, or told any “don’ts.” He did not give any instructions to Private Hendry in the way of “don’ts” before he was directed to go up Black Hill. Private Hendry presented credible testimony confirming the fact that he was never told to tie down his antenna, or informed as to the requirements set forth in the permit that antennas should be tied down when going under power lines, or that crossings should be made at points within a minimum of 25 'feet and maximum 50 feet from power poles. However, Private Hendry testified that he was aware of the dangerous possibilities resulting from contact between a radio antenna and a power line.
39. (a) The third platoon commanded by Second Lieutenant Hohertz, which had been ruled out of the maneuvers, also started proceeding up Black Hill immediately behind Lt. Mayone. Lt. Hohertz testified that he was not looking up the hill as he was climbing up it, and did not actually see Private Hendry on the hill, or the accident, until after he heard him cry out — scream. Immediately thereafter, he looked up, went to Private Hendry who was then lying on the ground still carrying his radio, and helped cover him up. Private Hendry was removed from the scene of the accident and taken away by helicopter within a very short time after the accident. Lt. Hohertz subsequently examined the antenna on the radio Private Hendry was carrying and observed a burnt mark on it at a point about 6 inches from the end thereof, which clearly demonstrated to him that this part of the antenna hit the power line. Lt. Hohertz could not *763 definitely recall seeing the power lines or any poles at any time before the 'accident. Thereafter, he observed the lines and the two poles on which they were strung, and noted that both poles were set in low spots at base elevations that he judged were lower than the elevation of the terrain between the poles; but he never made any actual measurements of the elevations of these poles. He stated that there was a crest of ground at the point on the hill where the accident happened ; that the line between these poles was sagging a lot; and that most of the other lines he saw also were sagging, because it was so hot out there in the desert.
(b) Lt. Hohertz testified that after viewing the scene of the accident, he had the unexpressed thought that if Private Hendry had crossed under the power line at any other point than where he did, that is if he had walked under the. power line on either side of the crest located at the point he was on the hill, or had walked under lines on poles other than the particular two involved here, he would not have been electrocuted. Lt. Hohertz stated that these a'forestated thoughts were just assumptions. Proper foundation was not laid for any such assumptions and there is no evidence to support the same. There is credible testimony in the record showing that the power line with which Private Hendry’s radio antenna came in contact between poles 45-1 and 45-2 was below the minimum prescribed vertical distance at several points between these two poles; therefore, it is entirely possible that Private Hendry could have been injured if he had crossed under the power lines at other places.
(c) Prior to “Desert Strike,” Lt. Hohertz was assigned to teach a class on the hazards of desert life, which included the subject of high-powered electrical lines. He testified that in connection with this subject, he was instructed that such lines (presumably in the desert where the maneuvers were to take place) were lower than normal because the heat would cause them to sag more than might be true somewhere else; and that he taught a class on said subject to Lt. Mayone’s company. Apparently in connection with the instructions given to him in teaching the class on this subject, Lt. Hohertz was told to be careful when passing under low power lines *764 with high antennas. He characterized the antenna, which Private Hendry was carrying at the time of the accident, as a “high antenna.” Lt. Hohertz was never informed before the maneuver that crossings, at least as to vehicles, under power lines should be between 25 and 50 feet of the poles, and he could not recall seeing any statement to that effect in the manuals and pamphlet issued by Division Headquarters for use of persons in teaching the class covering the matter of power lines. Lt. Hohertz was not told subsequent to the accident to instruct his platoon to cross within certain distances of power poles, or to lower or tie down antennas, when they were going under power lines. According to Lt. Hohertz, nothing was said about this subject matter after the accident because everyone was aware of the dangers involved. Lt. Hohertz was not furnished with a “Don’ts” list prior to the time the maneuver commenced or during the course thereof.
40. Copies of the maneuver permit finally signed by the parties were not furnished to the Desert Strike Command Headquarters, Company Commanders, officers, or other persons charged with the conduct of, or engaged in, the maneuver operations, by Col. Peacock or the Los Angeles Engineer District. Nor is there any evidence that the restrictions set forth in the permit, particularly with respect to the tie-down of antennas and the points where vehicular crossings over plaintiff’s rights-of-way were to be made, were ever called to the attention of any military office or personnel. The District did prepare what Col. Peacock termed a “Don’ts list,” which purportedly referred to certain things mentioned in the permit that were not supposed to be done because such actions might generate claims. This list was sent to the major Command, i.e., Desert Strike Command Headquarters, with a recommendation that a copy of the list be placed in the hands of every soldier engaged in the maneuvers. According to Col. Peacock, this list included, among a large number of things, information concerning the tie-down of antennas. There is no evidence that this particular list was ever distributed in accordance with the above-mentioned recommendation or that the information contained therein was passed on to personnel involved in maneuver operations. An undated *765 document, entitled “DESERT STRIKE” was introduced in evidence (Pltf’s Ex. 43). Under the heading “DON’TS,” 21 items are listed. Under the heading “DO’S,” eight items are listed. Item No. 4 appearing under the “Do’s” is the only-one in this document that mentions “antennas” and is pertinent here. Item (paragraph) 4 reads as follows:
4. Do operate all vehicles moving under high voltage electrical transmission lines with extreme caution. The clearance between the lines and vehicles with antennas or other gear may be insufficient to prevent a high-voltage arc to the vehicle.
There is no evidence that the above-mentioned document containing lists of “Don’ts” and “Do’s” is the same as to form and content as the one prepared by the Los Angeles District. Nor is there any evidence showing what, if any, distribution was made of this, or any other similar, document.
41. (a) There is no evidence that at any time either before or after the maneuver permit was signed, plaintiff furnished to the Los Angeles Engineer District or other Government office, a marked-up map showing certain desired information, as requested in Lt. Col. Marshall’s letters of March 9, 1964 (finding 16 (a), (b)), and mentioned in Col. Peacock’s March 19, 1964 letter (finding 18). In this connection, the record contains documentary evidence in the form of a certificate dated May 6, 1969, and signed by Col. Norman E. Pherson, Corps of Engineers, then District Engineer of the Los Angeles Engineer District, in which he certified, in substance, that the official records of the Los Angeles Engineer District relating to the military exercise involved here include Drawing No. 33-M-5 entitled “Desert Strike Maneuver Area, California, Arizona and Nevada Military Reservation”; that by letter directed to the plaintiff at its headquarters office in San Francisco, under date of March 19,1964, the corporation was informed of the information that had been requested from its offices at Searchlight, Nevada, and Needles, California, i.e., the information outlined in the third paragraph of the respective letters sent to those offices under date of March 9, 1964 (partially quoted and/or mentioned in finding 16(a) and (b)), concerning, among other things, the *766 location within the maneuver area of points where crossings over plaintiff’s facilities could be made safely, and the voltage and minimum height above ground of existing transmission lines; that a search of the District records failed to locate a marked-up copy of Drawing 33-M-5 or any other drawing showing the location of plaintiff’s facilities within the designated maneuver area.
(b). In view of the foregoing and the failure of plaintiff to affirmatively show that it actually did supply the Government with a marked-up copy of the map in question indicating thereon information requested, or furnish such data either orally or in writing, it may be reasonably concluded that plaintiff never provided the Government with the specified information, except to the extent the same is directly or inferentially indicated by the wording of the maneuver permit itself.
42. (a) In connection with the facts set forth in finding 41 (a) and (b) supra, and contrary to the obvious implications suggested thereby that defendant did not have any information concerning either the points where crossings under plaintiff’s transmission lines could be made safely, or the location, minimum height above ground and voltage of these lines, the following facts should be noted:
(b). As mentioned in finding 11, supra, along in the fall of 1963, the Los Angeles Engineer District provided assistance to the “Strike Command” by way of making a reconnaissance of the desert area in order “to size up the dangers involved of holding DESERT STRIKE in the area” contemplated, and taking other stated actions. While the record does not disclose that any particular responsible military or Government official actually viewed the specific spot or immediate vicinity thereof where the accident involved here occurred, it may be reasonably assumed from the record considered as a whole that the entire maneuver area between Needles, California, and Searchlight, Nevada, particularly including the area known as “Black Hill” and the area in the immediate vicinity thereof over which plaintiff’s lines were strung on standing poles, was visually surveyed or studied, since the taking of “Black Hill” was one of the objectives assigned to the com *767 pany of which Private Hendry was a member. Certainly, considering the foregoing and the fact that the directors of the maneuver were on notice, constructive if not actual, from the content of the maneuver permit itself that plaintiff’s transmission lines were strung across the land involved, the Government had a duty to survey the maneuver area for the purpose of discovering possible dangerous conditions before ordering military personnel to operate therein; to put the troops on notice of any conditions that appeared to be dangerous ; and to issue specific instructions with respect to precautionary measures to be taken by the soldiers, in line with the provisions of the maneuver permit agreement entered into by and between plaintiff and the Army.
(c). Col. Peacock admittedly was very well acquainted with the maneuver area and knew about plaintiff’s existing transmission lines, having served in the particular area concerned here for about 9 months during World War II. For a period of several weeks covering a period before, during, and after the maneuvers, he had an office set up and staff functioning under his direction in Needles, California, which he visited periodically for 2 or 3 days at a time. He and members of his staff were part of so-called “neutral forces” and did not actually participate in the maneuvers “per se,” but rather limited their activities to performing the function of providing logistical support for the operation. There is no direct evidence showing that Col. Peacock or responsible members of his staff ever actually observed plaintiff’s transmission lines over the area where the accident happened; however, considering the intimate knowledge they had concerning the planned maneuver, the duties of their assigned role of providing logistical support for the operation, the familiarity with the area with which they must necessarily have had in order to perform their supporting position of providing logistical support for the operation, and the close proximity of their work headquarters to the critical area involved, it is found that they knew, or should have known of the existence of these lines.
(d). The first unnumbered paragraph under “Part II— Facility Bights” of the maneuver permit agreement makes *768 it clear that the Army was alerted to the fact plaintiff’s wires were energized with voltage at which electricity is transmitted for public use, information which it may be reasonably concluded the Government could have obtained had it been sufficiently interested in doing so, and, in any event, should have presumed.
(e). The second unnumbered paragraph under Part II of the permit granted the Armed Forces of the Government permission to extend communication lines over and across plaintiff’s rights-of-way under certain conditions. Numbered paragraph 1 of said Part states “[t]hat all clearances [obviously referring to the clearances of the lines to be strung by the Government] will be observed as provided in the last publication of the National Electrical Code for use in Clark County, Nevada, and General Order No. 95 for use in the State of California.” Numbered paragraph 3 of said Part authorized the Government to use certain devices for the purpose of fastening any of the Armed Forces’ communication lines to plaintiff’s power poles.
(f). Carl S. Myers, the local agent of plaintiff’s Division office at Searchlight, Nevada, presented credible testimony to the effect, among other things, that within 2 weeks prior to the commencement of the maneuver he observed Army personnel in and about the desert area south of Searchlight; that after the start of the maneuver he saw communication lines laying on the ground under plaintiff’s transmission lines “* * * all over this Black Mountain, in every direction.” Mr. Myers made it plain in his testimony that he saw these lines in the immediate vicinity of the place where the accident involved occurred. The Government inferentially admits these communication lines belonged to the Government and were left on the ground by its personnel. Defendant does not deny that these lines were strung across plaintiff’s property before the time of the accident. While there is no specific evidence that the lines were attached to plaintiff’s poles 45-1 and/or 45-2, the testimony of Mr. Myers and other evidence provides the basis for a reasonable assumption that this was done. Considering the foregoing in connection with the facts set forth in (e), above, particularly, it is also reasonably *769 assumed that the Armed Forces’ communication lines were extended across plaintiff’s rights-of-way under the direction and supervision of authorized and responsible Government personnel; therefore, it is concluded and found that the lines were or should have been strung between plaintiff’s poles by duly designated and authorized Government personnel at clearances specified in numbered paragraph 1 under Part II of the maneuver permit; and that at the times these lines were strung, responsible Army personnel observed or should have observed the height of plaintiff’s transmission lines between poles 45-1 and 45-2, and by visual comparison of the height thereof with the height at which the Government’s communication lines were strung or were supposed to be strung, knew or should have known at least the approximate' height of plaintiff’s lines, whether plaintiff’s lines in the Black Hill area were or appeared to be below the required minimum height, and whether plaintiff’s lines were strung at such a low level at some points in said area that it would or might be dangerous for troops to cross plaintiff’s rights-of-way at such points. Accordingly, the Government should have taken appropriate action in an attempt to have plaintiff’s lines in the area raised to at least the required minimum height, or at least to a height that would enable military personnel to safely pass under the lines, or to post appropriate off-limit signs at points at which lines were or appeared to be so low as to constitute a danger to foot traffic; or to have taken some other appropriate action to warn or prevent military personnel from passing under any of plaintiff’s lines strung across Black Hill considered by defendant to be dangerously low.
(g). Numbered paragraph 3 under Part II of the permit provided “[t]hat vehicles, tanks, trucks, crossing under electric lines will cross between minimum 25 and maximum 50 feet from any pole”; but neither this nor any other provision in the permit specified where foot crossings should be made by military personnel or limited such crossings in any way. While the facts set forth in finding 43 (b) indicate that it was the understanding of plaintiff’s District Manager at Needles, California, that both vehicular and foot crossings under plaintiff’s lines were to be made within the above- *770 stated minimum and maximum distances from any pole, the plain and unambiguous wording of the permit shows that no such understanding was warranted. However, the restrictions placed on vehicular crossings under plaintiff’s lines does imply that all crossings at points between minimum 25 and maximum 50 feet from any pole would be safe and suggest that crossings at distances more than 50 feet from a pole might present some danger at least to vehicles. It may be assumed that the provision that said crossings be made not closer than 25 feet from any pole was inserted, among other reasons, as a precaution against persons, equipment, and vehicles damaging the same. It may be reasonably assumed that the provision that crossings be made at a maximum distance of 50 feet from any pole was to limit the crossing areas in order to minimize the portions of plaintiff’s rights-of-way subject to potential disturbance; that plaintiff knew that its transmission lines were more likely to be higher within 50 feet of the poles than at other points along the lines; and that the lines might sag considerably at points more than 50 feet between two poles, particularly at times of the day when temperatures in the desert during the period of the year for which the maneuver was scheduled are normally quite high and cause the lines to expand.
(h). Considering the foregoing facts, it is further concluded and found that the Government knew or should have known of the existence and location of plaintiff’s transmission poles and lines, the voltages of these lines, the approximate minimum height above ground of the lines, and the points where crossings under plaintiff’s high voltage lines could be made most safely by Government personnel, all in the area of plaintiff’s rights-of-way between poles 45-1 and 45-2.
43. (a) Subsequent to the accident, investigations of a varying nature were made by or on behalf of both the plaintiff and the Government. During the course of an investigation that Mr. Myers (identified in finding 42(f)) personally made at the scene of the accident on the afternoon thereof, he visually inspected the entire line between poles 45-1 and 45-2 and noted a bum mark on the line hereinbefore referred to (finding 4(b)) as the west or uphill line. He did not note any *771 other burn marks on this or the other two lines. While there is no direct evidence that Private Hendry’s radio antenna struck plaintiff’s power line at the point where the bum mark was noted, plaintiff does not seriously dispute the validity of defendant’s assertion that this is true. The best evidence in the record establishes that the bum mark was the point where the antenna came in contact with plaintiff’s power line, and that the vertical clearance of the power line at the point of contact was 13 feet 4 inches, which both parties admit was below the minimum vertical clearance permitted at the point in question by certain applicable rules and regulations. Mr. Myers testified that in his opinion the temperature at the time he measured the line was around 90°, possibly more, but less than 100°.
(b). Mr. Myers made a report of the investigation conducted by bim to his supervisor, Mr. Lowell J. Kays, who, as District Manager stationed at the District Headquarters office in Needles, was in charge of plaintiff’s entire operation between Needles and Searchlight. The office at the latter place was a Division within Mr. Kays’ District. In a report, dated May 20,1964, prepared on the basis of Mr. Myers’ findings concerning the accident, and sent to plaintiff’s headquarters office in San Francisco, Mr. Kays stated, among other things:
* * * We had three interruptions yesterday on our 69 KV line and there is no doubt in my mind that this was caused by the military.
Evidently they do not seem to be too concerned about the safety of their men or they would at least make their crossings under our line as agreed to in the letter to Mr. Cooper of March 27th from Earl G. Peacock, Colonel, Corp of Engineers, District Engineer.
(c) Paragraph number 1 under “Part I — Land Bights” of the maneuver permit agreement granted the Government the right to enter upon the lands and rights-of-way of plaintiff in order that military personnel engaged in the military exercises, “with their * * * vehicles and equipment, may enter, travel, maneuver upon * * * air drop personnel and equipment, pass over * * * Company land, subject to tie *772 down of radio antennas on all vehicles, equipment and tanks * * [Emphasis supplied] Portable radios, both with and without antennas attached thereto, of the type carried by Private Hendry at the time he was injured certainly must be considered as coming within the term “equipment,” as that word is used in the permit. In view of the foregoing, it is found under the permit agreement the Government was granted the access and use rights stated in paragraph 1 mentioned above, subject to the condition, among others, that radio antennas, not only on the tanks and other vehicles but also on portable radios carried by soldiers crossing on foot, be tied down; that Private Hendry should have been under instructions from the Army to tie down the antenna on the radio he was carrying at the time he was ordered to enter upon and pass over plaintiff’s rights-of-way; and that the antenna on his radio should have been tied down while he was on plaintiff’s rights-of-way.
(d) In connection with the above, it is significant to note that credible testimony presented by Mr. Myers shows that at the time he made his investigation on May 18, 1964, he observed many tanks and other vehicles on and near Black Hill, including the area in the immediate vicinity of pole 45-1; that the radio antennas on the tanks were up; and that he did not see antennas on any of the tanks or other vehicles with their radio antennas tied down. While there is no direct evidence that any soldiers other than Private Hendry walked under plaintiff’s lines with their radio antennas extended, it is clear from the evidence that the Army did not comply with requirements of the permit with regard to the tie-down of antennas when crossing over plaintiff’s rights-of-way property, in that military personnel made crossings under some of plaintiff’s power lines both on foot and in vehicles while the antennas on their radios were not tied down.
44. In addition to Mr. L. E. Cooper, Vice President and Chief Engineer, a number of employees below him in the line of administrative authority within the plaintiff corporation testified at the trial, namely: Mr. A. B. Gilbertson, an engineer in plaintiff’s headquarters office, who had supervisory duties and responsibilities relating to the construction, *773 maintenance, and operation of electric facilities, including tlie power lines in question; Mr. William G. Sanders, an engineer who was a Division Engineer in 1964, and is now an Electrical Engineer in the headquarters office, with authority that generally requires his approval of power transmission-line construction; Mr. Lowell J. Kays, District Manager stationed at plaintiff’s office in Needles, California, who was in charge of plaintiff’s entire operation between Needles and Searchlight; Mr. Neil Kennard, Division Engineer at Needles, who performed the detail work under Mr. Kays’ supervision involved in preparing budgets, drawings, and work orders relating to the construction of new lines, and rebuilding and maintenance of existing lines; Mr. Roy St. Coeur, Line Foreman at Needles, who supervised all construction and maintenance of plaintiff’s lines between Needles and Searchlight; and Mr. Carl S. Myers, the plaintiff’s local agent at the Searchlight Division office (mentioned hereinbefore— finding 43(a)). Messrs. Kennard, St. Coeur and Myers worked under the immediate supervision and direction of, and reported directly to, Mr. Kays. The testimony of the above-named witnesses, which is, in some respects, contradictory, conflicting, inconsistent, and incredible, when considered in light of other acceptable evidence in the record, provides the basis for the following facts deemed to be relevant and material to the issues in this case.
45. The Engineering Department in plaintiff’s headquarters office prepares the final designs for construction of new electric power transmission lines. The standards covering the design, construction, and maintenance of such lines in the State of California, are contained in General Order No. 95, issued by said State. On the basis of material contained in said order, plaintiff prepared a document, entitled “Clearance Tables, C.R.G. General Order No. 95,” which sets forth, among other things, minimum vertical clearance standards to be followed by plaintiff in constructing and maintaining its power lines. The vertical clearances of new lines constructed by plaintiff in the State of Nevada are determined and established in conformity with regulations prepared by plaintiff on the basis of provisions of the National Electri *774 cal Safety Code in effect at the time of construction, to the extent such provisions have been adopted into law by that State.
46. Plaintiff’s power lines in the area in question between Needles and Searchlight were purportedly constructed in accordance with the provisions and standards set forth in the National Electrical Safety Code in effect at the time of construction many years prior to the accident involved here. Plaintiff never considered it necessary to raise this line so as to maintain required vertical clearance standards contained in the National Electrical Safety Code in effect either at the time of the accident, or at the time of construction, and had not done so. Plaintiff knew that its power lines should, at least, be kept at the minimum vertical clearance in effect at the time its power lines were constructed.
47. Plaintiff considered the “maintenance” of lines to include, among other tilings, the general repair of both defective and damaged lines and poles, correction of dangerous conditions and elimination of safety hazards along the lines, straightening of poles found to be out of plumb, and replacement of broken and damaged equipment involving the poles and lines. However, if a line were found to be too low, it would not be classed as a maintenance problem if it was decided that a pole should be interset between existing poles, since the intersetting of poles was considered “construction.”
48. Plaintiff has a Safety Committee comprised of personnel in the headquarters office. There is no evidence that the Committee prepared or recommended the issuance of any rules that would serve as guidelines to plaintiff’s line inspectors and other employees in determining whether the vertical clearance of an exising line at any particular point created a dangerous situation. Plaintiff did not issue written rules or instructions to be used as standards by its employees in determining whether the vertical clearance of a line at any point was such that it should be reported or the line raised. The only guidelines would be in the National Electrical Safety Code then in effect and the lines are “usually,” but not necessarily, maintained in accordance with such standards. Plaintiff felt that the mere fact that the vertical clearance *775 of the line did not meet the requirement of the Code in effect would not necessarily mean that the line constituted a safety hazard, as this would depend on the location of the line, i.e., whether it was in an isolated or inaccessible area or used by pedestrians, persons on horses, or vehicles. However, in prescribing minimum vertical clearances, the National Electrical Safety Code considers, among other things, these factors.
49. If a line inspector found 'a pole damaged or out of plumb, he would be required to report this matter, but if he simply found that the line did not meet the vertical clearance requirements of the National Electrical Safety Code then in effect, he was not obligated to report this fact.
50. In determining whether the vertical clearance of a line was not adequate at a particular point, Mr. Kays would use as a guideline, the provisions of either the Code in effect at the time the line was originally constructed or the new Code, this being a matter left to his discretion and judgment. As to the lines in question, Mr. Kays was the only one who issued instructions with respect to the vertical clearance standards and guidelines to be followed in the course of making line inspections.
51. At the time of the accident involved here, Messrs. St. Coeur and Myers were required to patrol and inspect the power lines between Needles and Searchlight, and to report to Mr. Kays any line found to be out of order, defective, or considered to be dangerous and a safety hazard. The lines near Searchlight were usually patrolled by Mr. Myers between the first and the fifth of each month. Mr. St. Coeur patrolled the lines about once a month. The inspections were made from the vehicle in which they were traveling. Sometimes binoculars were used. If something appeared to be abnormal, they would get out of the car, walk to the pole or line, and make a closer inspection. They were not required to make actual measurements of lines, and made determinations as to a line being at the proper height “by observation.” Prior and up to the time of the accident, these employees were never given instructions by Mr. Kays or anyone else connected with plaintiff, with respect to the minimum vertical height at which the lines should be at any point or in *776 a particular area. These line inspectors were familiar with, and had read at least some portions of, the National Electrical Safety Code, General Order No. 95 issued by the State of California, the Linemen’s Handbook, and California-Pacific Utilities Standard Construction Book, which plaintiff had available for use in constructing new lines, rebuilding existing lines, and maintaining plaintiff’s existing poles and lines; however, it is quite clear from the testimony of these witnesses that in the course of performing their respective duties, they did not normally refer to any of these publications, and made judgments on the basis of their observations as to whether a line met the required minimum vertical clearance standards or was so low as to constitute a safety hazard. They did not report a line as being too low simply because it did not meet the vertical height clearance standards established by any of the above-mentioned publications.
52. (a) Messrs. Kays, St. Coeur, and Myers were thoroughly familiar with the lines between poles 45-1 and 45-2, and none of them considered the lines to be too low at any point between these two poles, principally because the area was not used by persons on foot, and ordinary motor vehicles could not make it up the hill on account of its steepness and the presence of large boulders and other obstructions. Mr. St. Coeur stated that in the 16 years he had worked for plaintiff and patrolled lines, he had never seen anyone walking in the area of Black Hill.
(b). On cross-examination, Mr. Kays testified to the effect that he would not consider the line between poles 45-1 and 45-2 to create a dangerous situation if it was 14 feet from the ground, but that a distance of 13 feet would be dangerous. Mr. Gilbertson testified that a line would have to be about 13 feet from the ground before he considered the line to be a safety hazard. Mr. St. Coeur stated that if he had found a wire to be as low as 13 feet, he would not consider this to be a safety hazard; that, however, if he had found the distance to be as little as 12 feet, he would have considered this to create a safety hazard, and tried to have a pole inter-set in between the two existing poles — for safety reasons. Mr. Myers stated that he did not consider the line on which *777 he noted the burn mark to be too low with relation to the ground “in that location.” In this connection, he stated that he had made a special visual inspection of the Black Hill area about a week before the accident and did not notice that either of poles 45-1 or 45-2 were out of plumb at that time; that on the day of the accident when he investigated the same and again the next day, he noticed that pole 45-1 was then out of plumb about a foot at the top and leaning in a northwesterly direction toward pole 45-2.
(c). Mr. Kays presented credible and unrebutted testimony to the effect that the Public Service Commission of the State of Nevada had never found plaintiff guilty of violating state law in the maintenance of its power line between Needles and Searchlight.
53. The policy and practice followed in Mr. Kays’ District with respect to line conditions considered dangerous was to immediately make necessary repairs and corrections, if at all possible. If such a condition could not be eliminated right away, the matter was reported and a man stationed to guard the point, or the power turned off, until the situation was corrected. If no one was available to stand guard, warning-signs or devices were placed in the area until the power was turned off or corrective action completed. No such warning signs or devices were placed in the area where the accident involved here occurred.
54. For many years, plaintiff had followed a construction program of intersetting power poles in' between existing poles along the line between Needles and Searchlight at an average rate of about 10 poles each year, if the budget permitted. The headquarters office approved work orders for the intersetting of a certain number of poles at the time plaintiff’s annual budget was adopted. Once the “work orders” had been approved, the poles were actually constructed pursuant to “job orders” issued and approved by either Mr. Kays or Mr. Ken-nard. Mr. St. Coeur recommended where poles should be in-terset and supervised the construction work in the field. The approval of the home office was not required before a pole could be interset, providing the work did not exceed the number of poles authorized by work orders previously approved *778 in the budget. Normally, recommendations concerning the intersetting of poles were submitted to the District Engineer, Mr. Kennard, for approval, and he signed the job orders authorizing the work. However, this practice was not always followed because Mr. Kays had the authority to approve work of this nature. About 2 years after the accident involving Private Hendry, Mr. Kays, after consultation with Messrs. St. Coeur and Myers, authorized and directed Mr. St. Coeur to interset a pole between poles 45-1 and 45-2. This work had not been previously programmed. The pole was installed and designated No. 45-lA, but the record does not definitely disclose the exact point between said poles at which it was set. The testimony as to the reasons why pole 45-lA was interset is conflicting. As best it can be determined, the pole was installed for the purpose of shortening the span in order to strengthen and stabilize the line, reduce pole loading due to high winds in the area, take up sag in the lines, decrease the possibility of the lines swinging together, and generally lessen the possibility of outages. The credible testimony shows that another reason for intersetting this particular pole was because Mr. Kays thought the lines between poles 45-1 and 45-2 were too low.
55. On August 22,196fi, Mr. Nelsen Myer, a registered land surveyor, made a personal survey of the area between the two poles previously referred to herein as poles 45-1 and 45-2, during which he took a number of measurements and notes. The measurements were made in the sun where the temperature was 110°. Although the evidence shows that another pole designated 45-lA was interset between poles 45-1 and 45-2 subsequent to the time he made his survey, employees of plaintiff having responsibilities involving the construction and maintenance of plaintiff’s lines testified that there had been no changes in construction of the line between poles 45-1 and 45-2 during the period following the accident and the date of Mr. Myer’s survey. On the basis of Mr. Myer’s field notes, one of his employees prepared a drawing, entitled “Vertióle Alignment Survey of Power Lines,” under Mr. Myer’s direction and supervision, which the latter approved and signed. (D’s. Ex. 87.) The drawing represents the natural *779 ground profiles beneath each of the three conductors comprising the line between poles 45-1 and 45-2. At several points between these poles, measurements were taken of the distance the east and west lines were from the ground. The relevant measurements evidence that the distance between pole 45-1, the southerly-most post, and pole 45-2 located to the west and north thereof about the middle of Black Hill, was 1048 feet; that the vertical heights of the east and west (downhill-uphill) lines were 16 feet 5 inches and 13 feet 9 inches, respectively, from the ground at a point 452 feet north of pole 45-1; and 14 feet 2 inches and 12 feet 4 inches, respectively, from the ground at a point 680 feet north of pole 45-1. It is apparent from the foregoing that some of plaintiff’s power lines between poles 45-1 and 45-2 were below the minimum prescribed vertical clearance at more than one point. Thus, since the antenna of Private Hendry’s radio could have extended into the air as high as 15 feet 2 inches (finding 38), he possibly could have been injured if he had walked under plaintiff’s power line at places between poles 45-1 and 45-2 other than the one where the accident occurred.
56. Mr. Neil Kennard, plaintiff’s Division Engineer at Needles, California, at the time of the accident in question, was responsible for the height at which plaintiff’s new power lines were constructed and at which new and old lines were maintained. Although Mr. Kennard visited the scene of this accident in the early summer of 1965, he never ascertained the height of the power line in question. He merely measured the distance from poles 45-1 and 45-2 to the spot where he assumed this accident had occurred, and observed that these poles were slightly out of plumb. Mr. Kennard testified that he was familiar with the National Electrical Safety Code; that plaintiff’s lines were maintained in accordance therewith, but did not necessarily have to be so maintained, as good mechanical standards could be used in lieu thereof; that he used the National Bureau of Standards Handbook 81, superseding H32, Safety Bules For The Installation and Mai/ntenanee of Electric Supply and 0omnmmication Limes, Comprising Part 2, the Definitions, and the Grounding Pules *780 of the Sixth. Edition of the National Electrical Safety Code, issued November 1,1961, in his normal day-to-day work; and that he used said Handbook 81 as a standard of maintenance for lines already in existence. Mr. Kennard testified further that Mr. St. Coeur was required to inspect plaintiff’s lines, and to know the provisions of the National Electrical Safety Code; that if it appeared to Mr. St. Coeur that a line was too low, he took measurements and gave them to him (Mr. Ken-nard) ; that he (Mr. Kennard) then would determine if these measurements met the requirements of the National Electrical Safety Code; and that if these measurements were below the standard prescribed by the Code, he would determine what was needed to achieve the Code’s clearance standards and make a recommendation that the line be raised to meet these standards, but that he did not make the decision to raise a low line. Using the formula set forth in finding 58, mfm, Mr. Kennard computed the minimum vertical clearance of the line in question and determined that the minimum height of the line should have been 18 feet 4 inches.[6] While it is clear from the record, including a review of the pertinent provisions of the National Electrical Safety Code, that Mr. Ken-nard’s calculation was in error and that he arrived at a height figure for this line that was less than actually required by the Code, neither plaintiff nor defendant disputed said computation, which established a minimum vertical clearance for the line involved here that was considerably higher than the height of the line at the time of the accident.
57. In the State of California, the standards for the construction and maintenance of electric power transmission lines are set by General Order No. 95. This order requires that power lines carrying more than 2,000 volts in rural areas accessible only to pedestrains be at least 25 feet above the ground, assuming a temperature of 60° E. and no wind. The basic minimum vertióle clearance of 25 feet is to be increased if the distance between poles is greater than 300 feet; and it is to be increased if the maximum temperature to be expected during a year is greater than 60°F. In addition, the basic *781 minimum vertical clearance of 25 feet may have to be increased depending upon the sag factor of the power line used.
58. In the State of Nevada, where Billy Joe Hendry was injured, the National Electrical Safety Code sets the standards for the construction and maintenance of electric power transmission lines. The Code at the time the lines in question were constructed,[7] as well as at the time of this accident,[8] required a basic minimum vertical clearance of 17 feet in areas accessible to pedestrians only where the span length was 350 feet, assuming the temperature to be 60° F., with no wind. Where the span length between poles was in excess of 350 feet, 1/10 of a foot for each 10 feet in excess of 350 feet was to be added to 17 feet as the minimum vertical ground clearance, or 7 additional feet in the present case
(1050 ft. - 350 ft.) X 1/10 ft.
10 ft.
In addition, four-tenths of an inch per 1,000 volts of electricity in excess of 50,000 volts was to be added to 17 feet as minimum vertical clearance. Furthermore, the minimum vertical ground clearance might have to be increased, but not decreased, depending upon the value of the sag factor of the line in question. The exact minimum vertical clearance at which plaintiff’s power lines should have been maintained is impossible to ascertain from the record because, among other factors, the temperature, which would increase the amount of sag if it exceeded 60° F., either at the time of Billy Joe Hendry’s injury or the maximum to be expected during the year, is not known, and the sag factor for a 69,000 volt power line of the wire at issue with a span of 1,050 feet is unknown. *782 It is clear from the record that the power lines involved here should have been considerably higher than the basic minimum vertical clearance of 17 feet, and were, in fact, considerably lower than 17 feet. These lines should have been higher because, among other things, temperatures considerably in excess of 60° F. could be expected and occurred, this was an area of high wind, rather than no wind, the span length in question was considerably in excess of 350 feet (700 feet in excess), and the minimum height would be increased by the sag factor of this line.
59. The vertical clearance of plaintiff’s power line at the point where Billy Joe Hendry was injured was 13 feet 4 inches. Thus, the height of this line was 3 feet 8 inches below the basic minimum vertical clearance of 17 feet required by the National Electrical Safety Code, which was adopted by the State of Nevada, and by plaintiff’s right-of-way contract with the Government. As stated in finding 57, the actual vertical clearance of this line was more than 10 feet 8 inches below the required minimum vertical clearance.
60. (¡a) Plaintiff’s failure to maintain its power lines in accordance with its contractual (rights-of-way) and statutory obligations not only created a dangerous situation, but constituted negligence per se. Considering, especially, the fact that just prior to the commencement of the military maneuvers, plaintiff’s agents, Messrs. St. Coeur and Myers, made two independent inspections of these lines then knowing that such maneuvers were to take place, plaintiff’s failure to discover and determine that the power line involved here was too low to meet its contractual and statutory obligations constituted negligence on the part of plaintiff. Plaintiff, having granted the permit involved here, and despite written requests for detailed information concerning, among other things, the location, height, and voltage of its lines, and the places where military personnel participating in maneuvers could safely cross under the lines on foot, failed to: warn defendant of this dangerous condition, except to the extent indicated by ambiguous language contained in the permit itself; mark, contrary to its established safety policy, or protect by guard or other device, this dangerously low power *783 line; or take any corrective action to raise tbe height of this line. Plaintiff’s only justification for its failure to take any of the above actions was explanatory testimony to the effect that considering the relative inaccessibility of this line and the lack or scarcity of people in the immediate area, this line was not unreasonably low. Such testimony is rejected as incredible on, at the very least, three grounds: (1) plaintiff and its agents knew, or should have known, that these maneuvers were scheduled to take place in the immediate area, and that the maneuvers would involve military personnel spread out over a wide area proceeding not only in vehicles but also on foot; (2) plaintiff’s agents also testified that a line at the height of the line in question was, or bordered upon being, dangerously low for such area, a fact confirmed by the credible testimony which shows that subsequent to the accident involved here, Mr. Kays, after consultations with Messrs. St. Coeur and Myers, directed that a pole be interset between poles 45-1 and 45-2 on which the lines were strung because the wires in this area appeared to be low; and (3) the National Electrical Safety Code specifically considers, among other factors, the accessibility and means of access in setting minimum standards to be observed in maintenance, as well as construction, of power lines. In view of the foregoing, it is concluded that plaintiff’s conduct in failing to reasonably and properly maintain its power lines, and in failing to give effective warning by any means, was unreasonable and negligent.
(b). The failure of the Army to: take even the minimum precautions required, at least inferentially, by the permit in question with respect to the tying down of antennas; discover that the line in question was dangerously low despite the fact the Government made a reconnaissance of the maneuver area and strung communication lines, supposedly in accordance with the National Electrical Safety Code, on the poles in question; and warn by any means its troops in the field not only that there were high voltage power lines in the immediate area of their assigned objective, i.e.: Black Hill, but that such lines were or might be dangerously low; and failure to cause corrective action to raise the height of this line is *784 unreasonable conduct and constituted negligence on the part of defendant.
(c). Had the power line in question been maintained in the requisite manner, the antenna attached to the radio carried by Private Hendry would not have come in contact with this line. On the other hand, had Private Hendry tied down the antenna, it would not have come in contact with this power line. Therefore, it is concluded and found that the respective negligent acts of plaintiff and defendant are inseparably entwined, and, together, constituted the direct and proximate cause of the injuries sustained by Private Hendry.
61. As a result of this accident, Private Hendry sustained severe burns of both of his legs, which were ultimately amputated. After amputation, 11 surgical procedures involving, among other things, plastic surgery or skin grafts, were performed on his legs. These procedures continued over a period of 2 years following the amputations and were very painful. In this connection, the record discloses that the Government paid medical expenses for the necessary care and treatment of Private Hendry in the amount of $7,460.48, which amount the parties stipulated during the trial was fair and reasonable.
62. Private Hendry retained the law firm of Miller and Gans of Houston, Texas, which subsequently retained Neil G. Galantz of Las Yegas, Nevada, as trial counsel, in connection with a claim against plaintiff for damages. On April 29, 1965, Billy Joe Hendry, a minor, by his Guardian ad litem, Boy B. Gubser, Jr., filed an action in the 8th Judicial District of the State of Nevada, in and for the County of Clark, against plaintiff praying for damages in the amount of $650,000. Thereafter, this case was transferred to the United States District Court for the District of Nevada.
63. After the case was transferred to the U.S. District Court, plaintiff’s attorney unsuccessfully attempted to have defendant take over the defense of the suit filed on behalf of Hendry. Thereafter, plaintiff filed a motion to serve a third-party summons and complaint directed to defendant, which was opposed by Hendry’s attorney and denied by the court. Although there is no evidence that defendant opposed said *785 motion, it is apparent that defendant did not cooperate in the defense of the suit and simply took a neutral position with respect thereto. (See findings 64(a) and 65.)
64. (a) The insurance carrier for plaintiff retained Edwin C. Leavitt of Las Yegas, Nevada, to defend the claim made on behalf of Hendry. In a letter dated March 3, 1966, addressed to Mr. Leavitt, Major E. Einkelstein, JAGG, Chief, Tort Branch, Litigation Division, Office of the Judge Advocate General, Department of the Army, Washington, D.C., stated:
This office has been advised of your request for assistance in investigating this case. The United States Army will furnish both parties to this action information as it would parties to an action in which the United States had no interest. We have instructed the attorneys for Billy Joe Hendry that they should not assert the Government’s medical care claim, and that we will not actively aid either party in the investigation of this case.
Any requests you have for information should be resubmitted to the Office of The Judge Advocate General, Department of the Army, Litigation Division, Attention: Chief, General Branch, Washington, D.C. 20310. Your requests should, as much as possible, specifically identify all information and documents desired.
(b) Despite the fact that it was indicated to plaintiff in the above letter that the Government did not intend to assert a claim for the medical care it had afforded Private Hendry, the Government subsequently did so. (See finding 67.)
65. On October 7,1966, a settlement in the sum of $350,000 was agreed upon and approved by the United States District Court for the District of Nevada. Defendant did not participate in, consent to, or authorize in any way whatsoever said settlement. During the trial of the instant case, it was agreed and stipulated that the sum of $350,000 was a fair and reasonable settlement of Hendry’s claim for damages for the injuries sustained by him as a result of the accident involved here.
66. Mr. Leavitt (finding 64(a)) performed a considerable volume of legal work in connection with the defense of the suit brought against plaintiff, and submitted a statement in *786 the amount of $30,001.27 for the services rendered by him. By agreement with plaintiff’s insurance carrier, the amount of this bill was reduced to $24,000, which sum was paid. Mr. Leavitt testified that he employed the services of a Dr. Irid W. Collins, an electrical consultant, to assist him in preparations to defend the suit; that Dr. Collins submitted a bill in the amount of $3,000 for the services performed by him; and that said sum was paid directly to Dr. Collins by plaintiff’s insurer, Pacific Indemnity Company; however, there is no documentation or any other evidence in the record that $3,000 was actually expended for Dr. Collins’ services, nor a showing that any payment that may hare been paid to him was reasonable or necessary in the defense of this lawsuit.
67. After plaintiff was served with process in the suit filed on behalf of Billy Joe Hendry, plaintiff requested indemnity from defendant, which it refused to grant. In this connection, it should be noted that under date of October 28,1966, Major Finkelstein sent Mr. Leavitt another letter which reads in part:
• Due to the complexities involved in the suit filed by Billy Joe Hendry against the California-Pacific Utilities Company, it was deemed advisable to not actively assert the Government’s medical care claim, in the amount of $7,406.48, until the suit was completed. As Billy J. Hendry has settled his claim against the Utilities Company, and further investigation of the incident giving rise to his injuries establishes clearly that they were the proximate result of the sole negligence of your client, it is requested this office receive full payment of the Government’s claim. * * *
We have carefully considered your assertion that the United States had an obligation to aid the California-Pacific Utilities Company in the defense of the Hendry suit. This claim is without merit. * * *
* * * it is requested that this office receive a draft, made payable to the United States Army, for $7,406.48. If no response is received to this request in thirty days, the Department of Justice will be asked to initiate the necessary litigation.
68. Thereafter, on December 4,1967, plaintiff filed a petition in this court, and filed an amended petition on August 11, *787 1969, wherein plaintiff prayed for judgment against defendant for the sum of $377,000, representing plaintiff’s settlement with Billy Joe Hendry, and counsel fees and expenses allegedly expended in the defense of his suit, plus interest, together with an unstated amount of costs and disbursements of the instant action. Plaintiff seeks to recover on the ground that the permit in question should be reformed so as to include an indemnity provision and recovery granted thereunder, or in the alternative, for damages for breach of contract for failure to take requisite precautions.
69. The defendant in its answer and counterclaim filed on April 3, 1968, as amended August 20, 1969, claimed, among other things, $7,406.48 as reasonable and necessary medical expenses due pursuant to 42 U.S.C.A. §§ 2651-2653.
Ultimate FINDINGS
70. On the basis of the aforegoing findings of fact and the evidence in the record considered as a whole, it is concluded and found that: (a) the permit in question represented the final agreement of the parties and did not include an indemnity provision; (b) defendant never agreed to indemnify plaintiff for damages arising out of accidents such as the one of concern here involving negligence on the part of plaintiff; (c) there was no mutual mistake made by the parties, either as to the legal effect of the applicable law or as to their intentions with respect to the inclusion of an indemnity provision in the permit agreement actually entered into and signed by the parties; (d) Col. Peacock did not have the authority to make any binding representations that an indemnity provision would be included in the permit; and (e) plaintiff did not rely on any such representations as were made with respect to the inclusion of an indemnity provision in this permit prior to the time it was signed by the parties. Therefore, reformation of this permit is inappropriate and should be denied.
71. It is further concluded and found that: (a) defendant failed to comply with certain conditions contained in the permit agreement in question, and observe precautions *788 required thereby; (b) plaintiff’s power line involved here was below the minimum height required by statute and by contract (both plaintiff’s right-of-way license and this permit) ; (c) the failure by defendant to observe these precautions and the failure by plaintiff to maintain this line at the proper and required height, and to warn persons of this condition, constituted negligence on the part of both parties; and (d) the said negligent acts of the parties are inseparable and, together, constituted the direct and proximate cause of the injuries Private Hendry sustained when the antenna attached to the radio he was carrying came into contact with the low line in question. Therefore, plaintiff is not entitled to recover damages on its breach of contract claim, and defendant is not entitled to recover on its counterclaim for the medical expenses it incurred and paid for the care of Private Hendry.
CONCLUSION OE Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover on its claim and that defendant is not entitled to recover on its counterclaim. Therefore, plaintiff’s petition and defendant’s counterclaim are dismissed.

 A11 references are to the Special Supplement to the C.F.R. as of April 1» 1984.

 National Bureau of Standards Handbook H32, Safety Rules For the Installation and Maintenance of Meetric Supply and Communication Lines, Comprising Part 2 and tbe Grounding Rules of tbe National Electrical Safety Code, issued September 23, 1941. National Bureau of Standards Handbook 81, superseding H32, Safety Rules for The Installation and Maintenance of Rlectrio Supply and Communication Lines, Comprising Part 2, tbe Definitions, and tbe Grounding Rules of tbe Sistb Edition of tbe National Electrical Safety Code, issued November 1,1961.

 In view of these facts, as a matter of convenience the words “owner” and “holder” of land often will be used herein with the intent that they be considered synonymous with persons and corporations having some legal interest or rights with respect to the lands involved in the military exercise “Desert Strike.”

 See finding 41(a) and (b), infra, for additional facts indicating that plaintiff at no time furnished the defendant a marked copy of this map showing the information specified in the March 9,1964 letters.

 The wording of the added provision is unknown since the record does not contain a copy of the permit purportedly enclosed with the letter nor any other evidence relative to the provision in question.

 The facts concerning the subject matters discussed and the representations and commitments made by Col. Peacock to Mr. Cooper and other company personnel during their conversations; and Col. Peacock’s understanding, intentions, and views regarding the kind and extent of the responsibilities and obligations which the Government assumed with respect to damage claims arising out of the military maneuver that might be made against plaintiff, as well as Mr. Cooper’s understanding as to these matters, when the access permit agreement involved here was finally signed by plaintiff and defendant, are set forth in detail in findings 25 to 34, inch, infra.

 It is assumed that this provision is the same or substantially similar to the one mentioned in Col. Peacock’s March 19, 1964 letter to plaintiff. (See finding 18 and n. 3.)

 Tile computation, made by Mr. Kennard was set forth on a piece of paper which was received in evidence as Defendant’s Exhibit 17.

 National Bureau of Standards Handbook H32, Safety Rules For The Installation and Maintenance of Electric Supply and Communication Limes, Comprising Part 2 and the Grounding Rules of the Fifth Edition of the National Electrical Safety Code, issued September 23, 1941. Rule 230® expressly requires that lines be maintained at the heights at which they were constructed. There is no evidence in the record as to the standards for minimum vertical clearance set by the National Electrical Safety Code at the time the power lines in question were constructed, but judicial notice thereof is hereby taken.

 National Bureau of Standards Handbook 81, superseding H32, Safety Rules For The Installation and Maintenance of Electric Supply and Communication Lines, Comprising Part 2, the Definitions, and the Grounding Rules of the Sixth Edition of the National Electrical Safety Code, issued November 1,1931..